118 P.3d 1155

Katsumi HONDA, Deceased, by Helen S. Honda, Petitioner, Appellant–Appellee

v.

BOARD OF TRUSTEES OF THE EMPLOYEES' RETIREMENT SYSTEM OF THE STATE of Hawai'i, Appellee–Appellant.

No. 23625.

Supreme Court of Hawai'i.

June 17, 2005.

Reconsideration Denied Sept. 15, 2005.

Diane Erickson and Kristin E. Izumi–Nitao, Deputy Attorneys General, on the briefs, for Appellee–Appellant.

Reid A. Nakamura and Guy C. Zukeran, Honolulu, (Oliver, Lau, Lawhn, Ogawa & Nakamura), on the briefs, for Appellant–Appellee.

NAKAYAMA, ACOBA, JJ., and Circuit Judge DEL ROSARIO, in place of DUFFY, J., Recused; and LEVINSON, J., Dissenting, with whom MOON, C.J., joins.

## Opinion of the Court by ACOBA, J.

We hold that Appellee–Appellant Board of Trustees of the Employees' Retirement System of the State of Hawai'i (the ERS Board) has a fiduciary duty to provide its members, including Appellant–Appellee Katsumi Honda (Katsumi), deceased, by Helen Honda (Helen), Petitioner, with clear, understandable information concerning retirement benefits. Its failure to do so in this case may have resulted in Katsumi's unilateral mistake with respect to his chosen mode of retirement and, additionally, constituted negligent misrepresentation. In that connection, the ERS Board's findings Nos. 18 and 19 regarding Katsumi's understanding and intent as to his choice of a retirement option appear clearly erroneous in view of the reliable, probative and substantial evidence in the whole record. In any event, assuming *arguendo* the findings were supported by substantial evidence, we are left with a firm and definite conviction that a mistake was made. *See Lanai Co., Inc. v. Land Use Comm'n,* 105 Hawai'i 296, 314, 97 P.3d 372, 390 (2004)

1. The Honorable Allene Suemori presided.

2. HRS § 602–4 provides that "[t]he supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law."

3. HRS § 602–5(7) (1993) confers upon the supreme court jurisdiction
 [t]o make and award such judgments, decrees, orders and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are

(asserting a "definite and firm conviction" that the Land Use Commission "made a 'mistake' " in its enforcement of an order). Helen did not raise these matters before the circuit court of the first circuit [1] (the court). However, in the exercise of our general superintendence of the trial courts, Hawai'i Revised Statutes (HRS) § 602–4 (1993),[2] and under our power to make such orders and mandates as necessary for the promotion of justice,[3] and based on the reasons stated herein, this case is remanded to the court with instructions to remand the case to the ERS for further proceedings. Consequently, the court's July 28, 2000 final judgment in favor of Appellant–Appellee is vacated and the case remanded as aforesaid to enable the ERS Board to hold further proceedings in light of the matters discussed in this opinion.

### I.

Katsumi was born on November 11, 1928 and obtained an eighth grade education. He began civil service employment in 1970 as a custodian at Kipapa Elementary School and had approximately twenty-three years of service at the time of his retirement.

In November 1993, upon reaching the age of 65, Katsumi requested estimates of his retirement benefits and a retirement application. On the request, Katsumi indicated that he would retire in June 1994. On December 10, 1993, Katsumi received a letter from the Branch Chief of the State of Hawai'i Employees' Retirement System (ERS) providing him estimates of the monthly benefits for four "Methods of Retirement." The letter indicated that the "Normal Option" would yield Katsumi $239 in monthly benefits.[4]

 or shall be given to it by law or for the promotion of justice in matters pending before it.

4. Helen's November 17, 1998 Petition to the ERS Board for declaratory order, *see infra,* states that the monthly benefits would be $240 per month but the letter dated December 10, 1993 from the ERS states that the monthly benefits would be $239 per month. However, the amount of $239 on the letter is crossed out and replaced with what appears to be a figure of $234. Thus, it is not clear what amount Katsumi was to be paid under the "normal option."

It is not clear when Katsumi received the application for retirement form (application). However, it was notarized on January 3, 1994. The application indicated that he checked off the "Normal" "Mode of Retirement" and listed his wife, Helen, as beneficiary.

In an affidavit submitted to the court, Helen stated that "[Katsumi] was afraid of heights and would not go to the [ERS] offices because they were not located on the ground floor. Because of that, [Katsumi] completed the calculations and application process by mail, without the assistance of any ERS personnel."

In or about March 1994, Katsumi was diagnosed with cancer and was admitted to Kuakini Medical Center on March 3, 1994. On March 25, 1994, Katsumi was released but continued with radiation therapy.

Katsumi was readmitted on April 2, with increasing shortness of breath and he died on April 6, 1994, five days after his retirement, from complications resulting from cancer.

Helen received a letter from the ERS retirement claims examiner dated May 24, 1994, informing her that she would not receive any benefits under her husband's retirement plan.

On November 15, 1998, Katsumi, by his wife Helen, filed a petition with the ERS Board for a declaratory order allowing Helen to select a new mode of retirement for Katsumi, retroactive to April 1, 1994. On August 16, 1999, the ERS Board issued its final decision denying Helen's request. The ERS Board concluded that Helen was not entitled to relief.[5]

On September 15, 1999, Helen appealed to the court.[6] On January 31, 2000, the court held a hearing on the appeal.

The court took the matter under advisement and on February 7, 2001, issued a minute order in favor of Helen. Helen filed a motion for clarification of the minute order and the court granted the motion, issuing findings of fact and an order on July 6, 2000. In essence, the court reversed the ERS

---

**5.** The ERS Board concluded *inter alia* as follows:

III. *CONCLUSIONS OF LAW*

....

9. The statute regarding retirement of Class C employees and the ERS' method of administering the Class C employees' retirement is not vague, ambiguous, or confusing.

10. Katsumi Honda never changed his mode of retirement before he retired on April 1, 1994, and therefore, his election of "normal" is irrevocable in accordance with the plain and unequivocal language of HRS section 88-283(b). HRS section 88-283(b) states that "[a]ny election of a mode of retirement shall be irrevocable."

11. Accordingly, [Helen] is not entitled to adjust the retirement election of her husband, and his election of "normal" stands.

**6.** She argued that (1) HRS § 88-282 does not provide a method of distribution for class C retirants participating in the ERS, (2) the parallel statute applicable to class A and class B retirants suggests that no "normal" distribution is authorized by § 88-282, (3) administrative rules cannot exceed statutory authority, (4) the statute regarding retirement of class C employees and the ERS's method of administering retirement for class C employees is vague, ambiguous, and confusing, and (5) Katsumi notified ERS of his anticipated passing and ERS breached its obligation to administer the ERS for the benefit of state employees.

With regard to her argument (5), Helen noted, as a point on appeal, that the ERS Board's finding no. 9 was erroneous. She stated that the

ERS offered no evidence that [Katsumi] had not communicated to them regarding his being diagnosed with cancer. In fact, the only evidence offered on this topic was the Affidavit of Arlene Kamakana [(Katsumi's daughter)], ... which stated that [Kamakana] advised Ms. Chow ([of] Kipapa Elementary School, where [Katsumi] was employed) and Ms. Corrine Kakuda (of the ERS), of [Katsumi's] anticipated passing....

Helen contended that "[n]o other evidence contradicting this statement was offered by ERS in its [p]osition [m]emorandum." She argued that the ERS

*is charged with the responsibility for administering retirement plans and benefits for retired employees of the State ....* The purpose of the ERS is to "provid[e] retirement allowances and other benefits for employees." *See ...* [HRS § 88-22]. *ERS was given knowledge of [Katsumi's] impending death yet allowed, without counseling[, Katsumi] to select a "normal" retirement payout and advance his retirement date ....*

....

*It is [Helen's] contention that the ERS erred in finding that [Katsumi] did not notify ERS of his diagnosis with cancer and breached its obligation to effectively administer the retirement plan by failing to properly advise [Katsumi] as to the effect of his election.*

(Emphases added.)

Board.[7] The court ordered that Helen be authorized to revise Katsumi's "election of a mode of distribution of retirement allowance to one of the three statutorily authorized methods described in [HRS] § 88–283." The court entered its final judgment on July 20, 2000. The ERS Board filed its notice of appeal on July 31, 2000.

## II.

■ On appeal the ERS Board raised several matters to which Helen responded.[8] On appeal from an agency decision and order the circuit court may affirm or remand the case or it may revise or modify the agency's decision and order. HRS § 91–14(g). On appeal to this court, the "standard of review [for secondary appeals] is one in which this court must determine whether the [circuit] court was right or wrong in its decision[.]" *Soderlund v. Admin. Dir. of Courts*, 96 Hawai'i 114, 118, 26 P.3d 1214, 1218 (2001) (brackets and citation omitted).

■ It is axiomatic that findings of fact by an agency must be disregarded if clearly erroneous because of a lack of substantial evidence, or if we are "left with a definite and firm conviction in reviewing the entire evidence that a mistake has been committed[,]" despite evidence to support the finding. *Bremer v. Weeks*, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004). Assuming, *arguendo*, there was substantial evidence to support the findings, we are left with a definite and firm conviction that a mistake has been made in view of the "entire evidence" as recounted herein.

## III.

■ Findings Nos. 18 and 19 of the ERS Board stated as follows:

18. Upon review of the ERS forms and documents completed and submitted by Katsumi Honda, it does not appear that he had trouble understanding the forms or following instructions. *There is no credible evidence in the record that Katsumi Honda did not understand.*

19. The Board finds that *[Helen] is speculating* on what Katsumi Honda did or intended.

(Emphases added.) The statement in No. 18 that there was "no credible evidence in the record that Katsumi ... did not understand" is unsupported by the record inasmuch as, from an objective standpoint, the retirement process and the forms themselves were not only confusing, but misleading. *See* discussion *infra* Parts V and VI. Indeed, Helen's affidavit to the Board stated that (1) Katsumi completed the application process by mail

---

7. The court determined that:

1. The Statutes relating to the retirement benefits of Class C Employees of the State of Hawaii (H.R.S. § 88–251, et.seq.) are vague, ambiguous and confusing.

2. The [ERS Board's] interpretation of the statutes relating to the retirement benefits of Class C Employees of the State of Hawaii is stretched and the offering of a "normal" distribution of retirement benefits is in excess of the statutory authority or jurisdiction of the agency.

3. The [ERS Board] did not make any attempts to provide reasonable accommodations for Mr. Katsumi Honda's disabilities in counseling him with respect to his retirement options.

8. On appeal, the ERS Board argues that (1) the court erred in concluding that HRS §§ 88–281(a) (1993), 88–282(a) (1993), and 88–283 (1993), relating to retirement benefits of non-contributory class C members of the ERS, were vague, ambiguous, and confusing; (2) the court erred in concluding that the ERS Board's interpretation of these statutes was incorrect and that the ERS Board exceeded its statutory authority or jurisdiction by offering "normal" as a method of distribution of retirement benefits for non-contributory class C members; (3) the court erred in concluding that the ERS Board did not make any attempts to provide reasonable accommodations for Katsumi's disabilities in counseling him with respect to his retirement options; and (4) the court exceeded its jurisdiction in authorizing Helen to retroactively revise an irrevocable method of distribution.

Helen responds that (1) the court was correct in determining that the ERS exceeded its statutory authority in offering a "normal" distribution option; (2) the court properly concluded that the ERS Board's interpretation of the statutes was incorrect; (3) the statutes and the ERS's method of administration are vague, ambiguous, and confusing; and (4) the court did not exceed its jurisdiction in authorizing Helen to retroactively revise an irrevocable method of distribution. In light of the disposition herein, we need not address these contentions. *See Taylor–Rice v. State*, 91 Hawai'i 60, 73, 979 P.2d 1086, 1099 (1999) ("[T]his court may affirm a judgment of the trial court on any ground in the record which supports affirmance.").

without the assistance of any ERS personnel, (2) Katsumi designated Helen as "beneficiary" on his retirement documents, (3) Katsumi selected "normal" retirement because he thought he would lose service credit, and (4) during his illness, Katsumi told Helen " 'not to worry' because she would receive his pension." [9] Thus, substantial evidence existed to support an inverse finding that Katsumi did not understand that by selecting "normal" retirement, Helen would not be entitled to survivor benefits. Accordingly, the Board's finding that "there [was] *no* credible evidence ... that Katsumi ... did not understand" (emphasis added) was not supported by substantial evidence or, assuming *arguendo* it was, the record gives rise to a definite and firm conviction that such a determination was a mistake.

Likewise, the record is bereft of any substantial evidence to support the statement in finding No. 19 that Helen was "speculating" on Katsumi's intent. The Board did not proffer a reason for questioning Helen's statements. Moreover, considering the record as a whole, the objectively misleading nature of the forms support Helen's contention that Katsumi believed she would receive his benefits upon his death. Katsumi designated her as "beneficiary" and, as discussed *infra*, no distinction between the meaning of "beneficiary" with respect to the "normal" option, and "beneficiary" with respect to options A, B, and C, was apparent on the face of the form.

### IV.

Inasmuch as Helen was the prevailing party below, she does not have to raise points of error in accordance with Hawai'i Rules of Appellate Procedure Rule 28(b)(4)(D). Although she did not specifically label her ar-

guments "unilateral mistake" or "negligent misrepresentation," she did represent to the Board that Katsumi indicated "she would receive his pension[,]" that the ERS was "alerted ... that [Katsumi] was *mistaken* as to the effect of his election[,]" and that "the ERS *breached* its obligation to effectively administer the retirement plan by failing to properly advise [Katsumi]." (Emphases added.) Indeed, Helen asserted breach of duty on three occasions: in her petition to the ERS Board and in her opening and reply briefs to the circuit court. In her supplemental memorandum in support of her petition to the Board, Helen argued that

> [d]espite having knowledge of [Katsumi's] condition and his election of retirement, ERS did not take any action to counsel [him] or his family as to the likely effect of his election. It is [Helen's] contention that *the ERS breached its obligation to effectively administer the retirement plan by failing to properly advise [Katsumi]* and that such breach resulted in [Katsumi] "forfeiting" his pension benefits.

(Emphasis added.) In her opening brief to the court, Helen reiterated this argument:

> It is [Helen's] contention that the ERS erred in finding that [Katsumi] did not notify ERS of his diagnosis with cancer and *breached its obligation to effectively administer the retirement plan by failing to properly advise [Katsumi] as to the effect of his election.*

(Emphasis added.)

In her reply brief, Helen argued that the Board "owes a *fiduciary duty* to the members of the retirement system[,]" (emphasis added), citing to an opinion letter from the Department of the Attorney General. The opinion letter stated that "[a]s their titles

---

9. Helen's affidavit stated:

3. [Katsumi] was afraid of heights and would not go to the [ERS] offices because they were not located on the ground floor. Because of that, *[Katsumi] completed the calculations and application process by mail, without the assistance of any ERS personnel.*

4. *[Helen] is the person designated as beneficiary* on [Katsumi's] [r]etirement documentation.

5. [Katsumi] was scheduled to retire on April 1, 1994.

6. *[Katsumi] selected "normal" retirement because he thought any other selection would*

*result in loss of service credit, including loss of his accumulated sick leave and military service and result in less pension benefits.*

[7.] In March of 1994, [Katsumi] was diagnosed with [c]ancer and, from the time of his diagnosis to the time of his demise, was under medication and/or radiation therapy. A majority of that time was spent in the hospital.

[8.] *During his illness and knowing of his impending demise, [Katsumi] told [Helen] "not to worry" because she would receive his pension.*

(Emphases added.)

indicate, the trustees of the [ERS] are, in both common and legal contemplation, trustees. They are entrusted with the duty and responsibility of administering the System for the benefit of the members of the System." Op. Att'y Gen. No. 64–25, at 8 (1964). The arguments in Helen's briefs recounted above serve to underscore the fact that, although not categorized under legal theories of mistake or fiduciary duty, such theories were essentially advanced by Helen and were contained in the record.

## V.

■ In regard to the unilateral mistake theory, Helen argued in her petition to the ERS Board that "[i]n similar circumstances, the legislature has expressed its intent to allow, in equity, dependents and beneficiaries to overcome *mistakes* in the retirement process." [10] (Emphasis added.) Insofar as the circumstances seem to indicate a mistake was made, a unilateral mistake by Katsumi would make his selection voidable.[11]

■ As to the doctrine of unilateral mistake:

Where *a mistake of one party at the time a contract was made as to a basic assumption on which he or she made the contract has a material effect on the agreed exchange of performances that is adverse to him or her, the contract is voidable by him or her if he or she does not bear the risk of the mistake under the rule stated in § 154,*

*and* (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) *the other party had reason to know of the mistake or his [or her] fault caused the mistake.*

AIG Hawai'i Ins. Co. v. Bateman, 82 Hawai'i 453, 457, 923 P.2d 395, 399 (1996) (quoting Restatement (Second) of Contracts § 153 (1979)) (emphases added) (brackets omitted). Additionally,

[a] party bears the risk of a mistake when (a) the risk is allocated to him or her by agreement of the parties, or (b) he or she is aware, at the time the contract is made, that he or she has only limited knowledge with respect to the facts to which the mistake relates but treats his or her limited knowledge as sufficient, or (c) the risk is allocated to him or her by the court on the ground that it is reasonable in the circumstances to do so.

Id. at 458, 923 P.2d at 400 (quoting Restatement (Second) of Contracts § 154 (1979)) (brackets omitted).

## A.

■ The record supports a finding that at the time the contract for retirement benefits was made, Katsumi believed his wife would receive retirement benefits. Katsumi listed her as "beneficiary" on the application form. Katsumi told Helen during his illness " 'not to worry' because she would receive his pension," thus indicating his intent was to give benefits to her.[12] No evidence was submit-

---

10. Helen relies on the legislative history amending HRS §§ 88–84, "Ordinary death benefits," 88–283, "Retirement allowance options," and 88–286, "Death benefits." That history shows that the legislature intended to ensure that beneficiaries of employees who died during service would have additional death benefit options. The legislature indicated that "[f]ailure to fill out or update a form should not prevent eligibility under the Employees' Retirement System." Stand. Comm. Rep. No. 269, in 1993 Senate Journal, at 915. In effect, the bill would allow "spouses and dependents to receive benefits they should, in equity, receive." Id.

11. Inasmuch as Helen, as appellee, would not raise points of error, this court may construe the arguments presented in her petition to the ERS Board and the opening brief to the circuit court. Cf. e.g. Mendes v. Hawaii Ins. Guar. Ass'n, 87 Hawai'i 14, 18, 950 P.2d 1214, 1218 (1998) (concluding that "[p]leadings should not be construed technically when determining what the

pleader is attempting to set forth but should be construed liberally so as to do substantial justice" (quoting Henderson v. Prof'l Coatings Corp., 72 Haw. 387, 395, 819 P.2d 84, 92 (1991))); LeMay v. Leander, 92 Hawai'i 614, 619, 994 P.2d 546, 551 (2000) (construing pleading, pursuant to the District Court Rules of Civil Procedure Rule 8(f) liberally, and finding that the petitioner "had violated the [Injunction] and thus committed indirect acts of civil contempt pursuant to [HRS] § 710–1077[1](g)" (brackets in original)); Henderson, 72 Haw. at 399, 819 P.2d at 92 (holding that although plaintiff does not specifically argue "a theory under the 'general law of negligence,' [still] we will assume that [she] does for the purpose of the following discussion").

12. No objection to Helen's affidavit is evident in the record. Indeed, the ERS Board relied on the affidavit for the fact that Katsumi was diagnosed with cancer in March 1994 and remained in the hospital for the majority of the time prior to his death. Inasmuch as the affidavit was submitted

ted to dispute this sworn testimony. This "assumption" was the "basic" one on which the agreement was made as between the ERS and Katsumi.

Additionally, Katsumi could have revised his mode of retirement prior to his actual retirement on April 1, 1994, but did not. Katsumi was diagnosed with cancer in or about the beginning of March 1994 and retired effective April 1, 1994. It is reasonable to conclude, in light of his statement to Helen, that had Katsumi known that she would not receive any survivor benefits, he would have modified his selection.

However, as mentioned previously, Helen was informed by the ERS that she would not receive any benefits. Hence, Katsumi's seeming mistake as to the assumption that Helen would receive benefits had a material effect on the agreement with the ERS that was adverse to him.

### B.

Katsumi would not bear the risk of the mistake because it was not allocated to him by the agreement between the ERS and himself. The record supports a finding that Katsumi was not aware at the time the contract was made that he had "only limited knowledge with respect to the facts to which the mistake relates[.]" *Bateman*, 82 Hawai'i at 458, 923 P.2d at 400. He (1) sent in a request for retirement estimates, (2) asked two questions on the request form regarding early retirement and payment of vacation leave, (3) received a retirement estimate in the letter from ERS, (4) obtained the application, (5) was provided the "Service Retire-

ment Facts" pamphlet (pamphlet),[13] and (6) signed the application.

### C.

### 1.

The circumstances indicate it would be reasonable to allocate the risk of the mistake to the ERS and that the ERS could have been at fault in causing the mistake. Restatement (Second) of Contracts § 153 (1979). First, the undifferentiated uses of the term "normal" and the dissimilar applications of the term "normal retirement" to describe a mode of retirement, and at the same time a category of eligibility for retirement, obfuscated the selection process.

The application indicated there are four modes of retirement fund distributions offered to class C members,[14] such as Katsumi: (1) "[n]ormal," (2) Option A, (3) Option B, and (4) Option C. The employee is required to choose one of the four options. The face of the application listed only the word "normal" to signify that retirement mode. On the reverse side of the application under the heading "Modes of Retirement," the application simply stated, "Normal retirement allowance payable for life," without any indication of a relationship between this designation and the word "normal" on the front of the application.

Also, on the reverse side of the application under a section titled "Eligibility Requirements" were the words "Normal Retirement" again. But rather than a mode of retirement, in this instance the words "Normal Retirement" referred to "*eligib[ility]* to re-

---

without objections, any objections are waived. *Dairy Rd. Partners v. Island Ins. Co.*, 92 Hawai'i 398, 423 n. 15, 992 P.2d 93, 118 n. 15 (2000). Moreover, strict rules of evidence do not apply to administrative proceedings such as those before the ERS Board. *See Desmond v. Admin. Dir. of the Courts*, 91 Hawai'i 212, 220, 982 P.2d 346, 354 (App.1998) ("Thus, the technical rules of evidence applicable to judicial proceedings generally do not govern agency proceedings." (quoting 2 Am.Jur.2d Administrative Law § 345 (1994)) (brackets omitted), *rev'd on other grounds*, 90 Hawai'i 301, 978 P.2d 739 (1998); *cf. Mortensen v. Bd. of Trs. of Employees' Ret. Sys.*, 52 Haw. 212, 219, 473 P.2d 866, 871 (1970) (clarifying that evidentiary rules applicable to the board hearings on retirement benefits are stated in HRS § 91–10 (1968)).

**13.** The ERS Board in its findings of fact no. 5 stated that:

> Along with the retirement estimates sent to Katsumi Honda, as is the usual practice of the ERS according to the affidavit of Karl Kaneshiro, the Enrollment, Claims, and Benefits Manager for ERS ..., Katsumi Honda was also provided with an information pamphlet entitled "Service Retirement Facts." This pamphlet explains in lay terms the various retirement plans and sets out the advantages and disadvantages of each of the plans.

**14.** Class C members are those members who did not contribute to the annuity savings fund for retirement. *See* HRS §§ 88–45, –46, and –47.

ceive a normal retirement allowance if you are 62 years old and have 10 years of credit service—or if you are at least 55 years old and have 30 or more years of credited service[,]" "[n]ot including any additional service for unused sick leave." (Emphasis added.) In the pamphlet, the mode of retirement indicated simply as "normal" on the application form is also referred to as "Normal Retirement."

According to Helen's affidavit, Katsumi "selected 'normal' retirement because he thought any other selection would result in loss of service credit, including loss of his accumulated sick leave and military service and result in less pension benefits." This would indicate confusion caused by use of the same term "normal retirement" in two different ways.

Second, the application was seemingly misleading because it required the naming of a beneficiary under the normal mode of retirement when, in effect, no survivor benefits would be distributed. The four modes of retirement contained on the application form were correlated with spaces for entering a beneficiary's name. Hence, when an employee chose "normal" under "Mode of Retirement" on the application form, the employee was directed to name a beneficiary as to that option. Options A, B, and C contained identical spaces for entering a beneficiary's name. This would cause one to reasonably conclude that a normal retirement beneficiary would occupy a status similar to the beneficiaries indicated in Options A, B, and C.

However, the ERS Board explained that a beneficiary of the normal retirement mode referred to a person entitled to the monthly payment owed a retirant who had died prior to the monthly payout. The ERS Board's finding of fact no. 16 explained that "[d]esignating a beneficiary for the 'normal' method of retirement is for purposes of informing ERS to whom to pay the balance of the member's pension if the member dies before payment is made to him or her." This expla-

nation, however, is not found on the application.

Hence, the face of the application does not inform the employee that a normal option "beneficiary," unlike the beneficiaries designated in Options A, B, and C, would receive only the balance of a monthly payment owing at the time of the retirant's death. The reverse side of the application, as previously mentioned, states merely, "Normal retirement allowance payable for life" under "Mode of Retirement," without any mention of the qualifications set out by the ERS Board in its finding 16. There is no notice on the application, then, that the "normal" option beneficiary in effect receives no benefits.

Third, the pamphlet did not define the terms used or employ language understandable in everyday terms so as to reasonably inform the employee of the consequences of choosing the normal option. The pamphlet lists as a disadvantage of "Normal Retirement," "No lifetime survivor benefit for beneficiary(ies)." This sentence is not explained. The terms "survivor benefit" and "beneficiary" are not defined. Again, in the pamphlet, "Normal Retirement" is used to describe a retirement option as well as a category of eligibility for retirement. One sentence— "The retirant receives a retirement allowance payable for life and in the event of death, there will be no further allowance payable[ ]"—is ambiguous with respect to whether it states only what is obvious and is seemingly inconsistent with the application form. In any event, in the overall context of what was provided to him as enumerated above, this one sentence was plainly insufficient to reasonably convey to Katsumi the net effect of choosing a normal retirement option.

### 2.

The application and the pamphlet borrowed extensively from statutory language. The legislature, however, has conceded that HRS §§ 88–282 and –283 were confusing.[15]

15. HRS § 88–282 (1993) stated as follows:

**Amount of Allowance.** (a) The amount of the annual normal retirement allowance payable to a retired member shall be one and one-fourth per cent of the average final compensation multiplied by the number of years of credited service.

(b) The amount of the annual early retirement allowance payable to a retired member shall be equal to the annual normal retirement allowance reduced by one-half per cent for each month the member is less than age sixty-two at retirement.

HRS § 88–283 (1993) stated as follows:

The House Standing Committee Report related that

> [y]our Committee notes that the [ERS] membership has experienced some *confusion* as to whether the normal retirement allowance in the Noncontributory Plan is an actual retirement option. *Your Committee recognizes the need to clarify the retirement options* since an option selection by an ERS member upon retirement is irrevocable, and each option has a different survivor benefit in the event of the retiree's death. . . .

Hse. Stand. Comm. Rep. No. 358, in 2001 House Journal, at 1264 (emphases added). Accordingly, the legislature amended HRS §§ 88–281(a), –282(a), and –283, to specify that normal retirement was one of the four modes of retirement available to ERS members. Were the statutes sufficiently comprehendible, the legislature would have no need to enact clarifications. Because the information conveyed by the ERS largely employs statutory language, *see supra*, obscurity in the statutory text was incorporated into the information distributed by the ERS.[16]

### 3.

■ Most significantly, the ERS Board occupies a fiduciary relationship to its members. The "board of trustees" of the ERS is vested with "[t]he general administration and the *responsibility for the proper operation of the retirement system* and for making effective the provisions of this part and part VII [ (benefits relating to class C members) ] of this chapter[.]" HRS § 88–23 (1993) (emphasis added). *See* Op. Att'y Gen. No. 64–25, at 8 (1964) (stating that "the trustees of the Employees' Retirement System are, in both common and legal contemplation, trustees" and that "[t]hey are entrusted with the duty and responsibility of administering the System for the benefit of the members of the System").

The fiduciary duties of the ERS Board include the duty to "provide retirees sufficient information to make an informed decision in electing a retirement option." *Ricks v. Missouri Local Gov't Employees' Ret. Sys.*, 981 S.W.2d 585, 592 (Mo.Ct.App.1998) (holding that retiree and his wife were given sufficient information to make an informed decision because "both a booklet and a memorandum explaining the retirement options was sent to all retirees").[17] The failure to provide understandable information would be a breach of the ERS Board's fiduciary duty "to provide sufficient information from which the retiree may make an informed decision." *Id.* at 592.

Here, the application and pamphlet did not contain unambiguous and understandable

**Retirement allowance options.** (a) A member may elect to have the member's normal, early, or disability retirement allowance paid under one of the following actuarially equivalent amounts:

(1) Option A: A reduced allowance payable to the member, then upon the member's death, one-half of the allowance, including fifty per cent of all cumulative post retirement allowances, to the member's beneficiary designated by the member at the time of retirement, for the life of the beneficiary;

(2) Option B: A reduced allowance payable to the member, then upon the member's death, the same allowance, including cumulative post retirement allowances, paid to the member's beneficiary designated by the member at the time of retirement, for the life of the beneficiary; or

(3) Option C: A reduced allowance payable to the member, and if the member dies within ten years of retirement, the same allowance, including cumulative post retirement allowances, paid to the member's beneficiary for the balance of the ten-year period.

(b) Any election of a mode of retirement shall be irrevocable.

16. The amendments do not address the defects that seemingly resulted in Katsumi's unilateral mistake or caused negligent misrepresentation. Such defects stemmed from the confusing nature, as enunciated herein, of the retirement application, forms, and procedures. Hence, the amendments to the statute do not solve the essential problem posed by the failure to adequately ensure that the intricacies of the retirement process must be ordinarily understood and to mandate that the ERS maintain "user friendly" administrative practices and procedures for its members.

17. In *Ricks*, the widow of a city employee filed an appeal from the denial by the Missouri Local Government Employees' Retirement System (LAGERS) of her survivor's pension benefits. 981 S.W.2d at 588. The Missouri Court of Appeals held that the LAGERS did not violate its fiduciary duty to provide sufficient information from which the retiree may make an informed decision because the "information provided to the Ricks[es] satisfied LAGERS' fiduciary duty." *Id.* at 592. *Ricks* is distinguishable because the clarity of the information was not at issue as it is here.

terms.[18] The text employed in the application and pamphlet should have conveyed a lucid description of the retirement options and the consequences of each choice. The application and pamphlet contained insufficient and seemingly inconsistent information. The pamphlet contained technical terms that were not defined or explained. The application and pamphlet should have been written in "user friendly," everyday language. *See Ortelere v. Teachers' Ret. Bd.,* 25 N.Y.2d 196, 303 N.Y.S.2d 362, 250 N.E.2d 460, 466 (1969) (explaining that, "in the relationship between retirement system and member, and especially in a public system, there is not involved a commercial, let alone an ordinary commercial, transaction" and that "[i]nstead the nature of the system and its announced goal is the protection of its members and those in whom its members have an interest"). Ultimately, the language contained in the application and pamphlet must be comprehensible to the ordinary person and fitted to the members of the ERS, some of whom may have a limited level of education.

### VI.

 Under the circumstances, Helen's argument that the "ERS's method of administration of the statute is vague, ambiguous and confusing," also sounds as a claim of negligent misrepresentation. This court has held that

> [n]egligent misrepresentation requires that: (1) false information be supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) the recipient relies upon the misrepresentation.

*Blair v. Ing,* 95 Hawai'i 247, 269, 21 P.3d 452, 474 (2001).

Here, the ERS, through its application form and pamphlet, may have negligently misrepresented to Katsumi that his wife would receive survivor benefits. The ERS Board failed to reasonably communicate the information regarding the normal mode of retirement. As recounted *supra,* the information provided to Katsumi outwardly appears to have misled him into believing that his wife, as beneficiary, would be paid his remaining benefits. Katsumi apparently relied on this information when completing the application. Ostensibly, then, he cannot be said to have made an informed decision as to his retirement choice. Conceivably, then, Katsumi suffered a loss of retirement benefits as a result.

Ultimately, the negligent misrepresentation as described in detail above, plausibly led to Katsumi unknowingly forgoing survivor benefits he intended for his wife. Under such circumstances and inasmuch as pecuniary losses are recoverable under claims for negligent misrepresentation, Helen should be able to recover the amount which she would have had, had Katsumi chosen an option which entitled her to survivor benefits. *See Bronster v. U.S. Steel Corp.,* 82 Hawai'i 32, 44–45, 919 P.2d 294, 306–07 (1996). In that context, selection of a different mode of retirement benefits would be an appropriate remedy for Helen.

### VII.

The choice of retirement options is a pivotal decision that may substantially affect the retiree's quality of living for the remainder of his or her life and the provision for loved ones upon the retiree's death. Such decisions should be informed ones, which are possible only if the choices are readily understandable. The ERS administers retirement and survivor benefits for the great number of civil servants employed by the state and the counties. The administration of such benefits directly impacts incidents of public service and the duties of the ERS with respect thereto, matters vital to the operation of the state and county governments.

The Board's responsibility in this regard requires the legal confirmation of a fiduciary duty to the ERS members. Only such a duty will assure that ERS members will not encounter the same or similar circumstances

---

18. For example, in setting out disclosure guidelines for consumer credit transactions, 15 U.S.C. § 1604(b) mandates the Board of Governors of the Federal Reserve System to publish disclosure forms that "aid the borrower or lessee in understanding the transaction by utilizing *readily understandable language."* (Emphasis added.)

evident here. The recognition of that duty arises in the context of this case. But the duty owed affects not only this case, but the manner in which all future ERS cases should be decided.

Despite what appears manifest in the record, the ERS made no findings with respect to the specific nature and sufficiency of information provided to Katsumi, nor did it do so in light of the fiduciary duty confirmed here. Under the facts of this case, we believe it appropriate pursuant to HRS § 91–14(g) to vacate the July 28, 2000 final judgment of the court and to remand to the court with instructions to remand the case to the ERS for further proceedings to consider the matters enumerated herein, in the framework of the entire record and in view of the ERS's fiduciary duty to retirees.

1. HRS § 88–281(a) provided in relevant part that "[a] member who has ten years of credited service and has attained age sixty-two ... shall become eligible to receive a normal retirement allowance after the member has terminated service."
 Effective July 1, 1994, the legislature amended HRS § 88–281 in respects not material to the present matter. *See* 1994 Haw. Sess. L. Act 276, § 11 at 865. Effective May 18, 2001, the legislature further amended HRS § 88–281 in respects that are relevant to the present matter, as discussed *infra* in section III.A.2. *See* 2001 Haw. Sess. L. Act 101, § 1 at 184–85. Effective June 24, 2003, the legislature again amended HRS § 88–281 in respects not pertinent to the present matter. *See* 2003 Haw. Sess. L. Act 199, § 3 at 455–56. Effective July 1, 2004, the legislature further amended HRS § 88–281 in respects not material to the present matter. *See* 2004 Haw. Sess. L. Act 179, § 26 at 872–73.

2. HRS § 88–282(a) provided that "[t]he amount of the annual normal retirement allowance payable to a retired member shall be one and one-fourth per cent of the average final compensation multiplied by the number of years of credited service." Effective May 18, 2001, the legislature amended HRS § 88–282 in respects that are relevant to the present matter, as discussed *infra* in section III.A.2. *See* 2001 Haw. Sess. L. Act 101, § 2 at 185.

3. HRS § 88–283 provided:
 **Retirement allowance options.** (a) A member may elect to have the member's normal, early, or disability retirement allowance paid under one of the following actuarially equivalent amounts:
 (1) Option A: A reduced allowance payable to the member, then upon the member's death, one-half of the allowance, including fifty per cent of all cumulative post retirement allow-

ances, to the member's beneficiary designated by the member at the time of retirement, for the life of the beneficiary;
 (2) Option B: A reduced allowance payable to the member, then upon the member's death, the same allowance, including cumulative post retirement allowances, paid to the member's beneficiary designated by the member at the time of retirement, for the life of the beneficiary; or
 (3) Option C: A reduced allowance payable to the member, and if the member dies within ten years of retirement, the same allowance, including cumulative post retirement allowances, paid to the member's beneficiary for the balance of the ten-year period.
 (b) Any election of a mode of retirement shall be irrevocable.
Effective May 18, 2001, the legislature amended HRS § 88–283 in respects that are relevant to the present matter, as discussed *infra* in section III.A.2. *See* 2001 Haw. Sess. L. Act 101, § 3 at 185–86. Effective January 1, 2004, the legislature further amended HRS § 88–283 in respects that are pertinent to the present matter, as discussed *infra* in sections III.B, III.C.3, and note 16. *See* 2003 Haw. Sess. L. Act 182, § 2 at 421–22. Effective July 1, 2004, the legislature again amended HRS § 88–283 in respects that are material to the present matter, as discussed *infra* in sections III.B, III.C.3, and note 16. *See* 2004 Haw. Sess. L. Act 179, § 27 at 873–75.
 HRS § 88–261(a) (1993) provides in relevant part that the phrase "actuarial equivalent" "shall have the same meaning[] as defined in section 88–21, unless a different meaning is plainly required by the context[.]" Effective June 16, 1997, the legislature amended HRS § 88–261(b) in respects not pertinent to the present matter. *See* 1997 Haw. Sess. L. Act 212, § 5 at 404–05.
 HRS § 88–21 (1993) provides in relevant part that "actuarial equivalent" is "a benefit of equal

Dissenting Opinion by LEVINSON, J., in which MOON, C.J., joins.

I dissent.

The appellee-appellant Board of Trustees of the Employees' Retirement System (ERS) of the State of Hawai'i [hereinafter, "the ERS Board"] appeals from the final judgment of the first circuit court, the Honorable Allene R. Suemori presiding, entered on July 28, 2000. As points of error, the ERS Board maintains that the circuit court erred in entering, on July 6, 2000, the findings of fact (FOFs) and order reversing the decision of the ERS Board and awarding relief to the appellant-appellee Katsumi Honda [hereinafter, "Katsumi"], Deceased, by Helen S. Honda [hereinafter, "Helen"], Petitioner.

On appeal, the ERS Board argues that the circuit court erred in: (1) finding that Hawai'i Revised Statutes (HRS) §§ 88–281(a) (1993),[1] 88–282(a) (1993),[2] and 88–283 (1993),[3]

which related to the retirement benefits of non-contributory class C members of the ERS,[4] were vague, ambiguous, and confusing; (2) finding that the ERS Board incorrectly interpreted HRS §§ 88–281(a), 88–282(a), and 88–283 and that the ERS Board exceeded its statutory authority or jurisdiction by offering "normal," *see supra* note 2, as a method of distribution of retirement benefits for non-contributory class C members; (3) finding that the ERS Board did not make any attempts to provide reasonable accommodations for Katsumi's disabilities in counseling him with respect to his retirement options; and (4) ordering that Helen, a non-ERS member, could retroactively revise an irrevocable method of retirement allowance distribution, inasmuch as the order exceeded the circuit court's jurisdiction.

In response, Helen contends: (1) that the circuit court correctly determined that the ERS Board exceeded its statutory authority in treating a "normal" retirement allowance as a distribution option; (2) that the circuit court rightly concluded that the ERS Board incorrectly construed HRS §§ 88–281(a), 88–282(a), and 88–283; (3) that HRS §§ 88–281(a), 88–282(a), and 88–283, as well as the ERS Board's administration of retirement allowances pursuant to the foregoing statutory provisions, were vague, ambiguous, and confusing; and (4) that the circuit court did not exceed its jurisdiction in ordering that Helen could retroactively revise an irrevocable method of retirement allowance distribution.

For the reasons discussed *infra* in section III, I would hold: (1) that the circuit court wrongly concluded that HRS §§ 88–281(a), 88–282(a), and 88–283 were vague, ambiguous, and confusing; (2) that the circuit court erroneously concluded (a) that the ERS Board incorrectly construed HRS §§ 88–281(a), 88–282(a), and 88–283, and (b) that treating the "normal" retirement allowance

as a distribution option exceeded the ERS Board's statutory authority or jurisdiction; and (3) that the circuit court erred in ordering that Helen, a non-ERS member, could retroactively revise an irrevocable method of distribution. I would also reaffirm the proposition, articulated in *Okada Trucking Co., Ltd. v. Bd. of Water Supply*, 97 Hawai'i 450, 40 P.3d 73 (2002), that "an appellate court cannot, under the auspices of plain error, *sua sponte* revisit a finding of fact that neither party has challenged on appeal." *Id.* at 459, 40 P.3d at 82.

Accordingly, I would vacate the circuit court's final judgment and remand this matter to the circuit court with instructions to affirm the August 16, 1999 final decision of the ERS Board.

## I. BACKGROUND

### A. The ERS Board's Relevant FOFs

For present purposes, I refer to the following FOFs entered by the ERS Board, which are undisputed except where otherwise noted:

1. ... Helen ... is the surviving spouse of Katsumi ..., a deceased retired member of the [ERS].

2. Katsumi ... was a Class C non-contributory member employed by the Department of Education [ (DOE) ] at K;ipapa Elementary School as a Custodian II from September 21, 1970 to April 1, 1994.

3. On November 21, 1993, Katsumi ... completed an ERS form entitled "Request for Retirement Estimates." In that form, Katsumi ... noted a definite retirement date of June 1994. At the bottom of the form, Katsumi ... wrote the following questions:

1. REQUEST FOR RETIREMENT APPLICATION FORM, FOR I

---

value to the accumulated contributions, annuity, pension or retirement allowance, when computed upon the basis of the actuarial tables in use by the system." The legislature amended HRS § 88–21 in 1994, 1997, 2002, and 2003, but, inasmuch as those amendments did not affect the definition of "actuarial equivalent," they are not germane to the present matter. *See* 1994 Haw. Sess. L. Act 108, § 2 at 249, and Act 196, § 2 at 473; 1997 Haw. Sess. L. Act 374, § 1 at 1166–67;

2002 Haw. Sess. L. Act 183, § 5 at 810; and 2003 Haw. Sess. L. Act 199, § 2 at 455. Effective July 7, 2004, the legislature amended HRS § 88–21, revising the definition of "actuarial equivalent" in a manner that is not pertinent to the present matter. *See* 2004 Haw. Sess. L. Act 182, § 3 at 884–85.

4. *See* HRS § 88–47(a)(3) (1993) (defining membership in class A, B and C).

MAY APPLY FOR RETIREMENT EARLIER THAN JUNE/94[.]

2. SHOULD I RETIRE IN DEC. 31, 1993, EXPECT TO HAVE LUMP SUM PAYMENT FOR VACATION LEAVE. DO I RECEIVE PAYMENT IN 1994 OR IS IT ACCOUNTABLE FOR 1993. THIS IS FOR TAX/REASON.

It is undisputed that Katsumi ... signed the bottom of this form....

4. On December 10, 1993, ERS responded to Katsumi['s] ... Request for Retirement Estimates and sent him estimates of his monthly benefits based upon a retirement date of July 1, 1994. Those monthly benefits differed depending upon which method of retirement Katsumi ... would elect (*i.e.,* "Normal Option," "Option A (50% Joint and Survivor)," "Option B (100% Joint and Survivor)," or "Ten–Year Guarantee"). In this way, since there were four (4) methods of retirement, there were four (4) monthly benefit amounts designated. In comparison to the other three (3) methods of retirement, the monthly benefit amount under the "Normal Option" was the highest figure at approximately $240.00....

5. Along with the retirement estimates sent to Katsumi ..., as is the usual practice of the ERS according to the affidavit of Karl Kaneshiro, the Enrollment, Claims, and Benefits Manager for ERS ..., Katsumi ... was also provided with an informational pamphlet entitled "Service Retirement Facts." This pamphlet explains in lay terms the various retirement plans and sets out the advantages and disadvantages of each of the plans. The retirement plans explained are: 1) Normal Retirement; 2) Option A (50% joint and survivor); 3) Option B (100% joint and survivor); and 4) Ten–Year Guarantee. For the normal retirement, the pamphlet states:

The retirant receives a retirement allowance payable for life and in the event of death, there will be no further allowance payable.

Advantages: Provides a maximum life time benefit for the retirant.

Disadvantages: No lifetime survivor benefit for beneficiary(ies).

The explanations for the remaining options make clear that a surviving beneficiary would receive a pension upon the retirant's death....

6. On December 31, 1993, after receiving retirement estimates from ERS, Katsumi ... completed his "Application for Service Retirement" requesting that his retirement allowance become effective April 1, 1994, thereby changing and advancing his previously noted retirement date of June 1994. On this same form, Katsumi ... also selected a mode of retirement. Under the statement, "I have read the information on the reverse side of this application and select the following mode of retirement," Katsumi ... checked the area marked "Normal" as opposed to the remaining three (3) areas marked "Option A (50% Joint and Survivor)," "Option B (100% Joint and Survivor)," and "Option C (Ten–Year Guarantee)." [Helen] was named beneficiary. This document was signed by Katsumi ... and subsequently notarized on January 3, 1994 pursuant to instructions....

7. The reverse side of the "Application for Service Retirement," which Katsumi ... was instructed to read in order to select his mode of retirement, outlines the same four (4) modes of retirement. For the normal retirement, it states, "Normal retirement allowance payable for life." There is no reference to a beneficiary being entitled to benefits upon death. In contrast, for Option A, Option B, and the Ten–Year Guarantee, a beneficiary who is entitled to benefits upon the retirant's death is specified. The last sentence of this document reads in capital letters, "ANY ELECTION OF A MODE OF RETIREMENT IS IRREVOCABLE FROM THE EFFECTIVE DATE OF RETIREMENT." ...

8. As supported in [Helen]'s affidavit, and undisputed by [Helen], in March 1994, Katsumi ... was diagnosed with cancer and was admitted to Kuakini Medical Center from March 3, 1994 to March 25, 1994.... He was again readmitted on April 2, 1994, and passed away on April 6, 1994 at the hospital.

9. Upon being diagnosed with cancer in March 1994, Katsumi ... did not contact or notify ERS, or make any changes with regard to his retirement plan, including method of retirement. This would also include advancing his retirement date since the uncontroverted evidence shows that he did this in December 1993.[5]

10. There is no evidence that[,] other than submitting two written questions to ERS by mail on his "Request for Retirement Estimates" on November 21, 1993 ..., Katsumi ... ever scheduled an office visit or called ERS for information.

11. There is no dispute that at the time of Katsumi['s] ... death, his selected method of retirement was "normal" and that he had retired on April 1, 1994.

12. Upon the death of Katsumi ..., his surviving spouse and beneficiary, ... Helen ..., was notified by ERS that under the normal retirement method selected by Katsumi ..., the only benefit payable would be the final payment of pension between the date of retirement to date of death (i.e., April 1, 1994, to April 6, 1994). The estimated and approximated amount was $46.00 and would be payable to [Helen] as named beneficiary.

13. If Katsumi ... had not died, as a retired member, he would have been receiving the maximum monthly pension permitted due to his selection of the "normal" method of payment of the retirement allowance.

14. Approximately four and one-half years later, on November 17, 1998, [Helen] filed a Petition to the [ERS Board] for Declaratory Order allowing [her] to select a new mode of retirement for ... Katsumi

..., to be effective retroactively to April 1, 1994.

15. There is nothing in the documents sent to Katsumi ... to suggest that election of any of the methods of retirement other than "normal retirement" would result in loss of service credit, loss of accumulated sick leave, and loss of military service.

16. Designating a beneficiary for the "normal" method of retirement is for purposes of informing ERS to whom to pay the balance of the member's pension if the member dies before payment is made to him or her.

17. There is no statutory provision permitting a deceased member's beneficiary to change the deceased member's method of retirement, including unforeseen circumstances.

18. Upon review of the ERS forms and documents completed and submitted by Katsumi ..., it does not appear that he had trouble understanding the forms or following instructions. There is no credible evidence in the record that Katsumi ... did not understand.

19. The [ERS] Board finds that [Helen] is speculating on what Katsumi ... did or intended.

20. The [ERS] Board adopted [Hawai'i Administrative Rules (HAR)] section 6–26–3 which requires all applications for retirement benefits to contain certain information, including "[t]he mode of retirement which the member elects under any of the plans for receiving retirement allowances described in [HRS] section[s] 88–83 [ (1993) ],[6] 88–282, and 88–283 .... " HAR section 6–26–3(a)(6).

---

5. As discussed *infra* in section I.C, Helen disputed FOF No. 9.

6. HRS § 88–83 provided in relevant part:
 **Election of mode of retirement allowance.** (a) Maximum allowance: Upon retirement, any member may elect to receive the maximum retirement allowance to which the member is entitled computed in accordance with the provisions described under section 88–74, 88–76, 88–78, or 88–80 and in the event of the member's death, there shall be paid to the member's beneficiary, otherwise to the member's estate, the difference between the balance of the member's accumulated contributions at the time of the member's retirement and the

retirement allowance paid or payable to the member prior to death.
 In lieu of this maximum allowance, the member may elect to receive the member's retirement allowance under any one of the optional plans described below, which shall be actuarially equivalent to the maximum allowance....

HRS § 88–83 further described five alternative options available to class A and B contributory members of the ERS, all of which were "actuarially equivalent" to the "maximum allowance." *See supra* note 3 (citing HRS § 88–21, which defines "actuarial equivalent").

Effective July 7, 1998, the legislature amended HRS § 88–83 in respects not material to the

B. *The ERS Board's COLs and Final Decision*

On August 16, 1999, the ERS Board issued its final decision regarding Helen's November 17, 1998 petition for declaratory order. In addition to the foregoing FOFs, the ERS Board entered the following COLs:

1. The general method of paying a retirement allowance is governed by [HRS] section 88–282(a).... [*See supra* note 2.]

2. "Retirement allowance" is defined in HRS section 88–21 as:

> [T]he benefit payable for life as originally computed and paid a member at the point of the member's retirement and in accordance with the mode of retirement selected by the member, exclusive of any bonus or bonuses.

3. HRS section 88–283(a) permits a Class C non-contributory member to choose a different mode or method of receiving a retirement allowance. If the member does not want to receive the "standard" or "normal" payment as described in HRS section 88–282(a), the member has three options to choose from as provided for in HRS section 88–283(a).... [*See supra* note 3.]

4. The availability of a Class C non-contributory member to choose either a "normal" mode of retirement allowance under HRS section 88–282(a) or one of the three methods described in HRS section 88–283(a), is further supported by the plain language in the opening statement of HRS section 88–282(a) which reads in pertinent part:

> A member may elect to have the member's normal ... retirement allowance paid under one of the following actuarially equivalent amounts ... [.]

Options A, B, and C are thereafter listed as "actuarially equivalent" retirement amounts to the "normal" retirement allowance.

5. In *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 931 P.2d 580 (1997), the Hawai'i Supreme Court stated:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*Id.* at 148, 931 P.2d 580. The plain language rule of statutory construction however does not preclude an examination of other sources to determine legislative intent, even when the language appears clear upon perfunctory review. *Sato v. Tawata*, 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995).

6. Among the purposes behind the creation of HRS sections 88–282 and 88–283, was to "provid[e] a typical career public employee with combined system and Social Security benefits substantially equivalent to the employee's pre-retirement income" and "enhanc[e] the opportunities for more individualized retirement planning." ... Reading together HRS sections 88–282 and 88–283, [the statutes] allow[ ] Class C non-contributory members who do not wish to designate, or do not have, a beneficiary to maximize their benefits during their lifetime and receive benefits that are "substantially equivalent to the employee's pre-retirement income" when combined with Social Security benefits, by selecting "normal" retirement. Therefore, to adopt [Helen's] interpretation of these sections (*i.e.*, read HRS sections 88–282 and 88–283 separately), would contradict and contravene the legislative purpose behind these statutes.

7. HAR section 6–26–3 designates that all applications for retirement benefits must contain certain information, including "[t]he mode of retirement which the member elects under any of the plans for re-

present matter. *See* 1998 Haw. Sess. L. Act 151, § 9 at 543–44. Effective January 1, 2003, the legislature further amended HRS § 88–83 in respects also not germane to the present matter. *See* 2003 Haw. Sess. L. Act 182, § 1 at 419–21.

Effective July 1, 2004, the legislature again amended HRS § 88–283 in respects not pertinent to the present matter. *See* 2004 Haw. Sess. L. Act 179, § 27 at 873–75.

ceiving retirement allowances described in [HRS] sections 88–83, 88–282, and 88–283 . . . ." HAR section 6–26–3(a)(6). To implement the non-contributory benefits plan, the ERS adopted administrative rules including HAR section 6–26–3(a)(6)[,] which had been in effect since 1989.

8. "Normal" retirement is a statutorily authorized mode of election of retirement benefits, and is one of four options available for Class C non-contributory members.

9. The statute regarding retirement of Class C employees and the ERS'[s] method of administering the Class C employees' retirement is not vague, ambiguous or confusing.

10. Katsumi . . . never changed his mode of retirement before he retired on April 1, 1994, and therefore, his election of "normal" is irrevocable in accordance with the plain and unequivocal language of HRS section 88–283(b). HRS section 88–283(b) states that "[a]ny election of a mode of retirement shall be irrevocable."

11. Accordingly, [Helen] is not entitled to adjust the retirement election of her husband, and his election of "normal" stands.

Based on the foregoing FOFs and COLs, the ERS Board denied Helen's request for a declaratory order allowing her to select a new mode of retirement for Katsumi.

### C. The Circuit Court's Judicial Review Of The ERS Board's Decision

On September 15, 1999, Helen filed a notice of appeal to the circuit court of the first circuit pursuant to HRS § 91–14 (1993).[7] In her opening brief, Helen asserted that the ERS Board erred in entering the following COLs and FOFs: (1) COL No. 8, which stated that "normal" retirement allowance is authorized by statute and available to Class C non-contributory members, Helen contending that "the [s]tatutes relating to Class C non-contributory members allow[ed] distribution on only one of three options designated in [HRS] § 88–283(a)"; (2) COL No. 9, which stated that "[t]he statute regarding retirement of Class C employees and ERS'[s] method of administering the Class C employees' retirement [was] not vague, ambiguous, or confusing[,]" Helen arguing that "[t]he manner in which the ERS [Board] . . . use[d] the term 'normal' in reference to the 'type' of retirement (i.e., 'normal,' 'early,' or 'disability') . . . and also for the mode of distribution of retirement benefits (i.e., 'normal,' 'Option A,' 'Option B,' and 'Option C')" was vague, ambiguous, and confusing; and (3) FOF No. 9, which stated that Katsumi did not notify the ERS or change his retirement plan (i.e., mode of allowance and retirement date) after being diagnosed with cancer in March 1994, Helen maintaining that the ERS Board "offered no evidence that [Katsumi] had not communicated to them . . . [his diagnosis, and] the only evidence offered on this topic was the Affidavit of Arlene Kamakana, . . . in which . . . Kamakana stated that she advised [Katsumi's employer at K;ipapa Elementary School] and [a representative of the ERS] of [Katsumi's] anticipated passing."[8]

7. HRS § 91–14(a) provides:

**Judicial review of contested cases.** (a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provision of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.

8. Kamakana's affidavit, which became part of the record during the agency proceeding before the ERS Board, stated:

ARLENE KAMAKANA, being first duly sworn on oath, deposes and says that:

1. Affiant is a resident of the State of Hawaii, the daughter of Retirant Katsumi Honda, deceased (hereafter, "Retirant") and has personal knowledge of the matters attested to herein.

2. At or about the time of Retirant['s] illness, Affiant contacted Arlene Chow, secretary at K;ipapa Elementary School where Retirant was employed.

3. Ms. Chow had previously assisted Retirant in obtaining papers from the [ERS] from Ms. Corrine Kakuda.

4. Affiant advised Ms. Chow and Ms. Kakuda that her father had been diagnosed with cancer and that we would move his anticipated retirement date from June 1, 1994 to April 1, 1994 as a consequence of his anticipated passing.

On January 31, 2000, the circuit court heard oral argument from both parties. On February 7, 2000, the circuit court issued a minute order finding for Helen and reversing the ERS Board's final decision, as follows:

AFTER CONSIDERATION OF THE WRITTEN SUBMISSIONS AND THE FILES HEREIN, THE COURT HEREBY REVERSES THE DECISION OF THE DEPARTMENT AND FINDS THAT: 1) THE LANGUAGE OF THE STATUTE IS VAGUE, ARBITRARY AND CONFUSING, 2) THE [ERS BOARD'S] INTERPRETATION IS STRETCHED, ... AND 4) NO ATTEMPTS WERE MADE TO PROVIDE REASONABLE ACCOMMODATIONS DUE TO [KATSUMI'S] FEAR OF HEIGHTS.[9]

On April 26, 2000, Helen filed a motion for clarification of the minute order, seeking specification of the relief that the circuit court had granted to her. On July 6, 2000, the circuit court entered FOFs and an order reversing the decision of the ERS Board and awarding relief to Helen:

### FINDINGS OF FACT

1. The Statutes relating to the retirement benefits of Class C Employees of the State of Hawaii (H.R.S. § 88–251, *et seq.*) are vague, ambiguous and confusing.

2. The [ERS Board's] interpretation of the statutes relating to the retirement benefits of Class C Employees of the State of Hawaii is stretched and the offering of a "normal" distribution of retirement benefits is in excess of the statutory authority or jurisdiction of the agency.

3. The [ERS Board] did not make any attempts to provide reasonable accommodations for [Katsumi's] disabilities in counseling him with respect to his retirement options.

9. Helen's petition to the ERS Board for a declaratory order, filed on November 17, 1998, stated that, "[d]ue to [Katsumi's] fear of heights[,] he would not go to the ERS offices[,]" citing her own affidavit as evidence. In particular, Helen's affidavit, which was attached to her petition, maintained that "[Katsumi] was afraid of heights and would not go to the [ERS] offices because they were not located on the ground floor. Because of that, [Katsumi] completed the calculations and application process by mail, without

. . . .

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. The Final Decision of the [ERS Board] is hereby reversed.

2. The relief requested by ... [Helen] in [her] Opening Brief, filed herein on November 19, 1999, shall hereby be granted. The specific grant of relief by this Order is the authorization for ... Helen ... to revise ... Katsumi['s] ... election of a mode of distribution of retirement allowance to one of the three statutorily authorized methods described in [HRS] § 88–283. Such revision of the election of a method of distribution shall be made within 60 days from the date of entry of this Order and shall apply retroactively to the date of ... Katsumi['s] ... retirement, April 1, 1994. Benefits shall be calculated in the following manner:

1) *From April 1, 1994 to the date of ... Katsumi['s] death,* the benefits payable shall be based upon [Katsumi's] entitlement as a Class C retirant;

2) *After the date of [Katsumi's] death,* benefits shall be paid to [Helen] as the beneficiary under the method of distribution selected until [Helen's] rights to such benefits shall terminate as provided under such election.

The payment of such benefits shall be made forthwith.

(Emphases in original.)

On July 28, 2000, the circuit court entered final judgment in favor of Helen and against the ERS Board. On July 31, 2000, the ERS Board timely filed a notice of appeal.

the assistance of any ERS personnel." During oral arguments before the circuit court, counsel for Helen asserted that "[Katsumi] couldn't get counseling because he had a fear of heights. He couldn't go up the elevator ... in the City Bank Building. So he worked it over the phone."

Nevertheless, the circuit court did not specifically address Katsumi's fear of heights in its written FOFs and order reversing the ERS Board's final decision.

## II. STANDARDS OF REVIEW

A. *Judicial Review Of The FOFs, COLs, And Final Decisions Of Administrative Agencies*

### 1. Secondary appeals

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision.

*Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (quoting *Bragg v. State Farm Mutual Auto. Ins.*, 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996)) (alteration in original). HRS § 91–14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"[U]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." *In re Hawaiian Elec. Co.*, 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (citing

*Outdoor Circle v. Harold K.L. Castle Trust Estate*, 4 Haw.App. 633, 638–39, 675 P.2d 784, 789 (1983)).

### 2. Deference to administrative agencies

. . . .

The standard of review for administrative agencies therefore consists of two parts: first, an analysis of whether the legislature empowered the agency with discretion to make a particular determination; and second, if the agency's determination was within its realm of discretion, whether the agency abused that discretion (or whether the agency's action was otherwise "arbitrary, or capricious, or characterized by . . . [a] clearly unwarranted exercise of discretion," HRS § 91–14(g)(6)). If an agency determination is not within its realm of discretion (as defined by the legislature), then the agency's determination is not entitled to the deferential "abuse of discretion" standard of review. *See, e.g., Allstate [Ins. Co. v. Schmidt]*, 104 Hawai'i 261,] 265–66, 88 P.3d [196,] 200–01 [ (2004) ]. If, however, the agency acts within its realm of discretion, then its determination will not be overturned unless the agency has abused its discretion.

. . . .

In summary, when reviewing a determination of an administrative agency, we first decide whether the legislature granted the agency discretion to make the determination being reviewed. If the legislature has granted the agency discretion over a particular matter, then we review the agency's action pursuant to the deferential abuse of discretion standard (bearing in mind that legislature determines the boundaries of that discretion). If the legislature has not granted the agency discretion over a particular matter, then the agency's conclusions are subject to *de novo* review.

### 3. The administrative agency's conclusions of law and findings of fact

Pursuant to HRS § 91–14(g), an agency's conclusions of law are reviewed *de novo, Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984), while an

agency's factual findings are reviewed for clear error, HRS § 91–14(g)(5).

*Paul's Elec. Serv. v. Befitel,* 104 Hawai'i 412, 416–20, 91 P.3d 494, 498–502 (2004).

### B. Judicial Review Of the Circuit Court's FOFs And COLs

This court reviews the [circuit] court's conclusions of law (COLs) *de novo* under the right/wrong standard. *Child Support Enforcement Agency v. Roe,* 96 Hawai'i 1, 11, 25 P.3d 60, 70 (2001). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it.... Thus, a[COL] is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Kane,* 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998).

*Troyer v. Adams,* 102 Hawai'i 399, 409–10, 77 P.3d 83, 93–94 (2003) (quoting *State v. Entrekin,* 98 Hawai'i 221, 225, 47 P.3d 336, 340 (2002) (some brackets in original and some added)).

On the other hand,

The [circuit] court's [findings of fact (]FOFs[) ] are reviewed on appeal under the "clearly erroneous" standard. *[In re Jane Doe, Born on May 22, 1976,* 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) ] (citing *State v. Naeole,* 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996)). A FOF "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). " 'Substantial evidence' ... is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Doe,* 84 Hawai'i at 46, 928 P.2d at 888 (quoting *State v. Wallace,* 80 Hawai'i 382, 391–92, 910 P.2d 695, 704–05 (1996)); *see also State v. Kotis,* 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999).

*Troyer,* 102 Hawai'i at 410, 77 P.3d at 94 (quoting *In re Jane Doe, Born on June 16, 1994,* 101 Hawai'i 220, 227, 65 P.3d 167, 174 (2003)).

### C. Statutory And Regulatory Interpretation

.... In construing statutes, we have recognized that

our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray [v. Administrative Dir. of the Court],* 84 Hawai'i 138,] 148, 931 P.2d [580,] 590 [ (1997) ] (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Barnett v. State,* 91 Hawai'i 20, 31, 979 P.2d 1046, 1057 (1999) (quoting *State v. Davia,* 87 Hawai'i 249, 254, 953 P.2d 1347, 1352 (1998)).

If we determine, based on the foregoing rules of statutory construction, that the legislature has unambiguously spoken on the matter in question, then our inquiry

ends. *See, e.g., (Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). When the legislative intent is less than clear, however, this court will observe the "well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous." *Brown v. Thompson,* 91 Hawai'i 1, 18, 979 P.2d 586, 603 (1999) (quoting *Keliipuleole v. Wilson,* 85 Hawai'i 217, 226, 941 P.2d 300, 309 (1997)). *See also Government Employees Ins. Co. v. Hyman,* 90 Hawai'i 1, 5, 975 P.2d 211, 215 (1999) ("[J]udicial deference to agency expertise is a guiding precept where the interpretation and application of broad or ambiguous statutory language by an administrative tribunal are the subject of review." ( [Q]uoting *Richard v. Metcalf,* 82 Hawai'i 249, 252, 921 P.2d 169, 172 (1996)[.] )). [Footnote omitted]. Such deference "reflects a sensitivity to the proper roles of the political and judicial branches," insofar as "the resolution of ambiguity in a statutory text is often more a question of policy than law." *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 696, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991).

The rule of judicial deference, however, does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose. *See Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984) ("To be granted deference, ... the agency's decision must be consistent with the legislative purpose."); *State v. Dillingham Corp.,* 60 Haw. 393, 409, 591 P.2d 1049, 1059 (1979) ("[N]either official construction or usage, no matter how long indulged in, can be successfully invoked to defeat the purpose and effect of a statute which is free from ambiguity. . . ."). Consequently, we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation. *See, e.g., Government Employees Ins. Co. v.*

*Dang,* 89 Hawai'i 8, 15, 967 P.2d 1066, 1073 (1998); *In re Maldonado,* 67 Haw. 347, 351, 687 P.2d 1, 4 (1984).

*In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i 401, 422–23, 83 P.3d 664, 685–86 (2004) (quoting *In re Water Use Permit Applications (Waiāhole),* 94 Hawai'i 97, 144–45, 9 P.3d 409, 456–57 (2000) (brackets and ellipsis points in original) (footnote omitted)).

### D. *Plain Error*

In *Fujioka v. Kam,* 55 Haw. 7, 514 P.2d 568 (1973), this court observed that "[i]t is the general rule that an appellate court should only reverse a judgment of a trial court on the legal theory presented by the appellant in the trial court." *Id.* at 9, 514 P.2d at 570 (internal citations omitted). Nevertheless, *Fujioka* also articulated the standard of review that we employ in determining whether to notice plain error in civil cases:

However, we have also said that the rule is not inflexible and that an appellate court may deviate and hear new legal arguments when justice requires. *We also stated that in the exercise of this discretion an appellate court should determine [ (1) ] whether the consideration of the issue requires additional facts, [ (2) ] whether the resolution of the question will affect the integrity of the findings of fact of the trial court[,] and [ (3) ] whether the question is of great public import. Greene v. Texeira,* 54 Haw. 231, 234–235, 505 P.2d 1169, 1172 (1973); *In re Taxes, Hawaiian Land Co.,* 53 Haw. 45, 53, 487 P.2d 1070, 1076 (1971), *appeal dismissed,* 405 U.S. 907, [92 S.Ct. 938, 30 L.Ed.2d 778](1972). *See also, Kennedy v. Silas Mason Co.,* 334 U.S. 249, [68 S.Ct. 1031, 92 L.Ed. 1347] (1948); *Duarte v. Bank of Hawaii,* 287 F.2d 51 (1961), *cert. den.* 366 U.S. 972, [81 S.Ct. 1938, 6 L.Ed.2d 1261] (1961)[ (]affirming the territorial Supreme Court's decision in *Bank of Hawaii v. Char,* 43 Haw. 223 (1959)[) ].

55 Haw. at 9, 514 P.2d at 570; *see also Montalvo v. Lapez,* 77 Hawai'i 282, 290–91, 884 P.2d 345, 353–54 (1994) (noting that "[t]he plain error doctrine represents a departure from the normal rules of waiver that govern appellate review" and reiterating the *Fujioka* test by way of this court's decision

in *State v. Fox,* 70 Haw. 46, 760 P.2d 670 (1988)); *Okada Trucking Co., Ltd. v. Bd. of Water Supply,* 97 Hawai'i 450, 459, 40 P.3d 73, 81 (2002) (quoting *Montalvo* ).

## III. *DISCUSSION*

A. *Pursuant To HRS §§ 88–281(a), 88–282(a), And 88–283, The ERS Board Had The Statutory Authority To Offer The "Normal" Mode Of Retirement Allowance.*

On appeal, the ERS Board asserts (1) that HRS §§ 88–281(a), 88–282(a), and 88–283, *see supra* notes 1 through 3, were neither vague, ambiguous, nor confusing and (2) that it correctly interpreted HRS §§ 88–281(a), 88–282(a), and 88–283 and did not exceed its statutory authority or jurisdiction by offering "normal," *see supra* note 2, as a method of distribution of retirement benefits for non-contributory class C members. I agree with the ERS Board.

### 1. *Plain language analysis*

As discussed *supra* in section II.C, when confronted with issues of statutory interpretation, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i at 422, 83 P.3d at 685 (internal citations and quotation signals omitted). In other words, "[f]ollowing our well-settled approach to statutory interpretation, we look first to the plain language of the statute." *Zanakis–Pico v. Cutter Dodge, Inc.,* 98 Hawai'i 309, 316, 47 P.3d 1222, 1229 (2002).

At the time that the present matter arose, HRS § 88–281(a) was entitled "Eligibility for retirement allowance" and provided that "[a] member who has ten years of credited service and has attained the age of sixty-two ... shall become eligible to receive a *normal retirement allowance* after the member has terminated service." (Emphasis added.) HRS § 88–282(a) was entitled *"Amount* of allowance" and provided that "[t]he *amount* of the annual *normal retirement allowance* payable to a retired member shall be one and one-fourth per cent of the average final compensation multiplied by the number of years of credited service." (Emphases added.) Finally, HRS § 88–283(a), entitled "Retirement

allowance options," provided that "[a] member *may* elect to have the member's *normal ... retirement allowance* paid under one of ... [three] *actuarially equivalent amounts ....*" (Emphases added.)

On its face, therefore, the statutory scheme underlying the modes of retirement allowance for non-contributory class C members of the ERS provided that, once the requirements set forth in HRS § 88–281(a) were met, members became "eligible to receive a 'normal' retirement allowance," the amount of which was defined by HRS § 88–282(a). In lieu of the normal retirement allowance amount defined by HRS § 88–282(a), members *were allowed to choose (i.e.,* "[a] member *may elect ...*"), if they so desired, to have their "normal" retirement allowance paid by one of three methodologies that were "actuarially equivalent" to the "normal" retirement allowance. Thus, the ERS Board had the statutory authority to offer Katsumi the "normal" mode of retirement allowance.

### 2. *Ambiguity analysis*

Assuming *arguendo* that there is some "doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in" the statutory scheme, we have observed that "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." *In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i at 422, 83 P.3d at 685 (internal citations and quotation signals omitted). In that connection, the only arguable ambiguity in the present matter is whether, on the one hand, HRS § 88–283 *required* non-contributory class C members of the ERS to select one of the three options enumerated therein or whether, on the other hand, the statute *allowed* members to choose one of the options instead of the "normal" retirement allowance.

The "context" of the entire statute, however, leaves no doubt that HRS § 88–283(a) allowed members to voluntarily elect Options A, B, or C as an alternative to the "normal" amount of retirement allowance. In contrast to the wording of HRS § 88–283(a), HRS

§ 88–283(b) stated that "[a]ny election of a mode of retirement *shall* be irrevocable." Thus, inasmuch as the statute included the word "shall" to indicate when its provisions were mandatory, I believe that we must construe the phrase, "[a] member *may* elect ... [,]" as preceding a non-exclusive list of alternative modes of retirement allowance available to non-contributory class C members. *Cf. In re Estate of Rogers*, 103 Hawai'i 275, 282–83, 81 P.3d 1190, 1197–98 (2003) (observing that "the term 'may,' as set forth in HRS § 560:2–114(a) ... is permissive, and not mandatory").

Moreover, we have also noted that "the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool." *In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i at 422, 83 P.3d at 685 (internal citations and quotation signals omitted). Unlike the ERS Board, I do not believe that the legislative history of the relevant statutes in the present matter sufficiently clarifies any alleged ambiguity. *See supra* section I.B. Nevertheless, we have observed that "[t]his court employs subsequent legislative history [for purposes of statutory construction, but] only 'to *confirm* its interpretation of an earlier statutory provision.'" *State v. Dudoit*, 90 Hawai'i 262, 268 n. 3, 978 P.2d 700, 706 n. 3 (1999) (quoting *Macabio v. TIG Ins. Co.*, 87 Hawai'i 307, 317, 955 P.2d 100, 110 (1998) (citation and internal quotation marks omitted) (emphasis added)); *see also In Interest of Doe*, 76 Hawai'i 85, 91 n. 10, 869 P.2d 1304, 1311 n. 10 (1994) (inferring the legislature's original intent based on a subsequent statutory amendment) (citing *Franks v. City and County of Honolulu*, 74 Haw. 328, 340 n. 6, 843 P.2d 668, 674 n. 6 (1993) ("[T]his court has used subsequent legislative history or amendments to confirm its interpretation of an earlier statutory provision."); *Mollena v. Fireman's Fund Ins. Co. of Hawaii, Inc.*, 72 Haw. 314, 324–25, 816 P.2d 968, 973 (1991) (subsequent statutory amendment construed to reflect original legislative intent)).

In 2001, after the parties had submitted their respective briefs, the legislature amended HRS §§ 88–281(a), 88–282(a), and 88–283, as follows:

" § 88–281 [Eligibility for retirement allowance.] *Service retirement.* (a) A member who has ten years of credited service and has attained age sixty-two, or a member with thirty years credited service who has attained the age of fifty-five, shall become eligible to receive a [normal] retirement allowance after the member has terminated service...."

. . . .

" § 88–282 [Amount of] *Service retirement* allowance. [(a) The amount of the annual normal retirement allowance payable to a retired member shall be one and one-fourth per cent of the average final compensation multiplied by the number of years of credited service. ... *Upon retirement from service, a member shall receive a retirement allowance as follows:*

*(1) If the member has met the requirements in section 88–281(a), (b), or (d) a maximum retirement allowance of one and one-fourth per cent of the average final compensation multiplied by the number of years of credited service; or*

*(2) If the member has met the requirements in section 88–281(c), an early retirement allowance equal to the maximum retirement allowance reduced by one-half per cent for each month the member is less than age sixty-two at retirement.*"

. . . .

" § 88–283 Retirement allowance options. (a) [A] *In lieu of the maximum retirement allowance described in sections 88–282, 88–284, and 88–285, a* member may elect to [have] *receive* the member's [normal, early, or disability] retirement allowance [paid] under one of the [following] *options described below, which shall be* actuarially equivalent [amounts:] *to the maximum retirement allowance:*

(1) Option A: A reduced allowance payable to the member, then upon the member's death, one-half of the allowance, including fifty per cent of all cumulative post retirement allowances, to the member's beneficiary designated by the member at the time of retirement, for the life of the beneficiary;

(2) Option B: A reduced allowance payable to the member, then upon the

member's death, the same allowance, including cumulative post retirement allowances, paid to the member's beneficiary designated by the member at the time of retirement, for the life of the beneficiary; or

(3) Option C: A reduced allowance payable to the member, and if the member dies within ten years of retirement, the same allowance, including cumulative post retirement allowances, paid to the member's beneficiary for the balance of the ten-year period. . . . "

2001 Haw. Sess. L. Act 101, §§ 1–3 at 184–86 (deletions denoted by strikethrough and additions denoted by underlining).

The following legislative history of the 2001 amendments confirms my interpretation of the statutory scheme:

> The purpose of this bill is to clarify the four retirement options in the Noncontributory Plan—normal retirement, Option A, Option B, or Option C—by specifying that the normal retirement option, which is the highest retirement benefit a retiree may receive in the Noncontributory Plan, be renamed "maximum allowance," similar to the Contributory Plan.
>
> Your Committee notes that the [ERS] membership has experienced some confusion as to whether the normal retirement allowance in the Noncontributory Plan is an actual retirement option. Your Committee recognizes the need to clarify the retirement options since an option selection by an ERS member upon retirement is irrevocable, and each option has a different survivor benefit in the event of the retiree's death. . . .

Hse. Stand. Comm. Rep. No. 358, in 2001 House Journal, at 1264 (emphasis added).

> The purpose of this bill is to clarify the four retirement options in the noncontributory plan of the [ERS] by renaming the "Normal Retirement Allowance" option, which is the highest retirement benefit a retiree may receive, the "Maximum Retirement Allowance" option . . . .

Hse. Stand. Comm. Rep. No. 742, in 2001 House Journal, at 1404 (emphasis added).

> The purpose of this measure is to clarify that there are four different retirement options in the noncontributory plan offered by the [ERS].
>
> . . . .
>
> Your Committee finds that four retirement options exist for noncontributory members of the [ERS]. Unfortunately, there seems to be confusion over the number and types of options available, particularly over the issue of whether or not receiving a "normal retirement" is considered an actual option. Since an option selection made by a member upon retirement is irrevocable, and each option contains a different survivor benefit in the event of the member's death, your Committee believes that it is important that the options be clearly identified. The measure accomplishes this by renaming the option of "normal retirement," to "maximum retirement," similar to the nomenclature used in the contributory plan, so as to avoid confusion over terms.
>
> Your Committee believes that this measure will clarify the retirement options available to noncontributory members of the [ERS]. . . .

Sen. Stand. Comm. Rep. No. 1033, in 2001 Senate Journal, at 1334–35 (emphases added).

> The purpose of this measure is to make clear that there are four different retirement options in the noncontributory plan offered by the [ERS].
>
> Your Committee finds that retirement options have been confusing in the past for noncontributory retirees because of terminology used for each option. An option once selected is irrevocable and can impact the benefits for a survivor. By renaming "normal retirement" to "maximum retirement," the terms for this option will be similar for both noncontributory and contributory plans and less confusion should result. . . .

Sen. Stand. Comm. Rep. No. 1732, in 2001 Senate Journal, at 1624 (emphasis added).

By virtue of the 2001 amendments, the legislature acknowledged and clarified that the statutory scheme had always provided four options for modes of retirement allowance, including the "normal" benefits plan. Thus, the subsequent legislative history of

the statutory scheme confirms my interpretation that the ERS Board possessed the statutory authority and jurisdiction to offer Katsumi the "normal" mode of retirement allowance.[10]

B. *Pursuant To The Plain Language Of HRS § 88–283(b), Katsumi's Election Of The "Normal" Mode Of Retirement Was Irrevocable.*

The ERS Board asserts that the circuit court exceeded its jurisdiction in authorizing Helen, a non-ERS member, retroactively to revise an irrevocable method of distribution. I agree.

At the time that the present matter arose, HRS § 88–283(b) provided that "[a]ny election of a mode of retirement shall be irrevocable." *See supra* note 3. This court need not engage in statutory interpretation to rule that no one, including Katsumi and Helen, could have ever altered the mode of retirement that Katsumi elected.[11] I note, however, that the legislature amended HRS § 88–283 in 2003 and 2004, (1) requiring spousal notification of any retirement benefit option selected by a member of the ERS, *see* 2003 Haw. Sess. L. Act 182, § 2 at 421–22, and (2)

providing that, "[i]n the event of the death of the retirant within one year after the date of retirement," a retirant's beneficiary "may elect to receive either" (a) "the death benefit under the retirement option selected by the retirant" or (b) "[t]he death benefit under option B; provided that the difference between the benefit that the retirant received and the benefit that would have been payable to the retirant had the retirant elected to receive a retirement allowance under option B shall be returned to the system," *see* 2004 Haw. Sess. L. Act 179, § 27 at 875. Nevertheless, the 2003 and 2004 amendments are neither retroactive nor necessary to interpret the original intent of the statute, because the plain language of HRS § 88–283(b), in its 1993 incarnation, is unambiguous. *See supra* note 3. Helen may not avail herself of the 2003 and 2004 provisions, inasmuch as the "spousal notification requirement" and the special beneficiary election provision were not part of HRS § 88–283(b) at the time that the present matter arose. Thus, based on the plain language of HRS § 88–283(b), the circuit court erred in allowing Helen retroactively to elect a mode of distribution of retirement benefits.

---

**10.** Based on the analysis set forth *supra,* it is unnecessary to refer to laws *in pari marteria* or to apply the principle of judicial deference to agency expertise in administrative construction. *See In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i at 422–23, 83 P.3d at 685–86.

Nevertheless, I note that "[w]hat is clear in one statute may be called upon in aid to explain what is doubtful in another." *In re Wai'ola O Moloka'i,* 103 Hawai'i at 422, 83 P.3d at 685. The ERS Board's administrative rule, HAR § 6–26–3(a)(6), provided that all applications for retirement benefits must contain certain information, including "[t]he mode of retirement which the member elects under any of the plans for receiving retirement allowances described in [HRS] sections 88–83, 88–282, and 88–283[.]" *See supra* sections I.A and I.B (noting the ERS Board's reliance on HAR § 6–26–3(a)(6) in its FOFs and final decision). It is undisputed by both parties that HRS § 88–83 is plain and unambiguous. An *in pari materia* reading of HRS § 88–83 confirms my analysis.

HRS § 88–83, *see supra* note 6, provided class A and B members with the default retirement option, "maximum allowance," which was the functional equivalent of the "normal" retirement allowance afforded to Katsumi by HRS § 88–282(a). *See supra* note 2. Moreover, HRS § 88–83 provides that

[i]n lieu of this maximum allowance, the member may elect to receive the member's retirement allowance under any one of the optional plans described below, which shall be actuarially equivalent to the maximum allowance. . . .

(Emphasis added.) For purposes of HRS § 88–83, "actuarial equivalent" is defined by HRS § 88–21, the same statute which defines "actuarial equivalent" for purposes of HRS § 88–283(a). *See supra* note 3. As discussed *supra* in note 6, HRS § 88–83 provided class A and B members five alternative options that were "actuarially equivalent" to the "maximum allowance," which mirrors my interpretation of HRS § 88–283(a) as offering alternatives to the "normal" retirement allowance provided for by HRS § 88–282(a). Thus, an *in pari materia* reading of HRS § 88–83 indicates that HRS §§ 88–282(a) and 88–283 provide four modes of retirement allowance, including "normal."

**11.** The circuit court granted relief to Helen on the basis that, because it believed that the statutory scheme had never authorized the "normal" mode of retirement allowance, equity required that Helen be able to elect one of the three options listed in HRS § 283(a). In light of the analysis set forth *supra* in section III.A, the circuit court's reasoning fails, and I would apply the plain language of HRS § 88–283(b).

C. *Based On The ERS Board's Unchallenged FOF Nos. 18 And 19, Which Are Binding On Appeal, And In Light Of Our Plain Error Standard Of Review, Helen Has No Valid Claims Of Unilateral Mistake Or Negligent Misrepresentation.*

The majority contends that the ERS Board failed to fulfill its "fiduciary duty to provide its members ... with clear, understandable information concerning retirement benefits[,] ... [which] may have resulted in Katsumi's unilateral mistake with respect to his chosen mode of retirement and, additionally, constituted negligent misrepresentation." Majority opinion at 214, 118 P.3d at 1157. Based on its review of the record, the majority asserts that, "had Katsumi known that [Helen] would not receive any survivor benefits, he would have modified his selection." Majority opinion at 219, 118 P.3d at 1162.

Nevertheless, Helen has never contended that Katsumi made a "unilateral mistake" or that there was some negligent misrepresentation on the part of the ERS Board. *See infra* section III.C.1. Furthermore, as noted *supra* in Section I.A, the ERS Board's FOFs, which were included in its August 16, 1999 final decision, specifically stated in relevant part as follows:

> 18. Upon review of the ERS forms and documents completed and submitted by Katsumi ..., *it does not appear that he had trouble understanding the forms or following instructions. There is no credible evidence in the record that Katsumi ... did not understand.*
>
> 19. *The [ERS] Board finds that [Helen] is speculating on what Katsumi ... did or intended.*

(Emphases added.) Helen has never challenged FOF Nos. 18 and 19, either before the circuit court, where she was the appellant, or in the brief that she filed in this court on secondary review.

It is noteworthy that, although the majority has gone to great lengths to avoid framing its analysis as an exercise of "plain error" review, *by definition,* the means by which the majority engages in its analysis *is* via the plain error doctrine. *See* HRAP Rule 28(b)(4) (2000) (characterizing a "plain error" as one that is "not presented"). Indeed, the majority rules that "the ERS Board's findings Nos. 18 and 19 ... appear *clearly erroneous* in view of the reliable, probative and substantial evidence in the whole record," but notes that, even "assuming *arguendo* the findings were supported by substantial evidence, [the majority is] left with a firm a definite conviction that a mistake was made." Majority opinion at 214, 118 P.3d at 1157 (some emphasis added and some in original) (citation omitted). By *sua sponte* assigning error to the ERS Board's unchallenged FOFs, the majority *necessarily* employs plain error review.

In refusing to acknowledge that it may *only* address the arguments it raises *sua sponte* by way of plain error review, the majority admits that "Helen did not raise these matters before the circuit court," but nevertheless frames its analysis pursuant to, *inter alia,* "the exercise of our general superintendence of the trial courts, [HRS] § 602–4 (1993),[12] and ... our power to make such orders and mandates as necessary for the promotion of justice, [HRS § 602–5(7) (1993)[13]]." Majority opinion at 214, 118 P.3d at 1157 (footnotes omitted). As discussed *infra* in section III.C.4, the majority's exercise of HRS §§ 602–4 and 602–5(7) "review" (1) radically diverges from our plain error jurisprudence by allowing this court to entertain arguments not raised by either party with virtually no limitation, thereby eviscerating the raison d'être of the plain error doctrine and (2) places this court in the untenable position of advocating for a particular

---

**12.** HRS § 602–4 provides that "[t]he supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law."

**13.** HRS § 602–5(7) provides that "[t]he supreme court shall have jurisdiction and powers"

[t]o make and award such judgments, decrees, orders and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to it by law or for the promotion of justice in matters pending before it.

party via legal theories that neither party has advanced.

For those reasons, I believe that the majority's approach sets a dangerous precedent, and, pursuant to *Okada Trucking* and our standard of review regarding plain error in civil matters, I would adhere to the ERS Board's unchallenged FOFs. *See infra* sections III.C.2 through 4.

1. *Throughout the present matter, Helen has never alleged unilateral mistake or negligent misrepresentation.*

As a preliminary matter, I note that Helen has not raised, at any point during the course of the present matter, the issues of unilateral mistake and negligent misrepresentation. Indeed, the majority *concedes* that Helen has not advanced either of the foregoing issues. *See* majority opinion at 214, 118 P.3d at 1157 (admitting that "Helen did not raise these matters before the circuit court"), 217, 118 P.3d at 1160 (acknowledging that Helen "did not specifically label her arguments 'unilateral mistake' or 'negligent misrepresentation' "), and 218, 118 P.3d at 1161 (recognizing that "[t]he arguments in Helen's briefs [before the ERS and the circuit court] . . . [were] not categorized under legal theories of mistake or fiduciary duty").

As recited *supra* in section I.C, Helen asserted her position before the ERS Board as follows:

[Helen] contends that: 1) the "normal" mode of election of retirement is not a valid option for Class C employees; 2) the statute governing retirement of class C employees and the [ERS's] method of administering that statute are vague, ambiguous and confusing; and 3) equity demands that [Helen] be allowed to adjust the retirement election of retirant Katsumi[,] . . . deceased.

The points of error that Helen raised in the circuit court are similar to the foregoing:

I. . . . ERS erred in ruling that

"Normal" retirement is a statutorily authorized mode of election of retirement benefits, and is one of four options available for Class C non-contributory members.

This conclusion of law is erroneous because the Statutes relating to Class C non-contributory members allows distribution on only one of three options designated in [HRS] § 88–283(a). . . .

II. . . . ERS erred in ruling that

The statute regarding retirement of Class C employees and the ERS'[s] method of administering the Class C employees' retirement is not vague, ambiguous or confusing.

The manner in which the ERS administers the statute uses the term "normal" in reference to the "type" of retirement (*i.e.*, "normal," "early" or "disability") . . . and also for the mode of distribution of retirement benefits (*i.e.*, "normal," "Option A," "Option B," and "Option C").

III. ERS erred in ruling that

Upon being diagnosed with cancer in March 1994, Katsumi . . . did not contact or notify ERS, or make any changes with regard to his retirement plan, including method of retirement. This would also include advancing his retirement date since the uncontroverted evidence shows that he did this in December 1993.

ERS is clearly in error in respect of this finding. ERS offered no evidence that [Katsumi] had not communicated to them regarding his being diagnosed with cancer. In fact, the only evidence offered on this topic was the Affidavit of Arlene Kamakana, . . . in which Arlene . . . stated that she advised Ms. Chow . . . and Ms. Corrine Kakuda . . . of [Katsumi's] anticipated passing. . . .

Helen's third point of error challenged only one of the ERS Board's FOFs, namely, FOF No. 9. *See supra* section I.C. Helen also argued in her opening brief that the "ERS was given knowledge of [Katsumi's] impending death yet allowed [him to proceed] without counseling [him] to select a 'normal' retirement payout and advance his retirement date[,]" thereby "failing to properly advise [Katsumi] as to the effect of his election." Helen's reply brief in the circuit court further maintained "the best interest of [Katsumi] was not considered" and that "the ERS and the immediate employer were aware of [Katsumi's] declining health and yet[ ] they failed to counsel him with respect to the effect of his selection." It is further noteworthy that the neither the ERS Board, in entering the August 16, 1999 final decision,

nor the circuit court, in entering its July 6, 2000 FOFs and order reversing the decision of the ERS Board, applied plain error review. *See supra* section I.B. and C.

Pursuant to the Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(c) (2000), Helen, as the appellee before this court on secondary appeal, did not need to include a statement of points in her answering brief. Nevertheless, I note that, in her answering brief, Helen merely reiterates the arguments that were subsumed in the points of error that she had previously asserted: (1) that the circuit court correctly determined that the ERS Board exceeded its statutory authority in treating a "normal" retirement allowance as a distribution option; (2) that the circuit court rightly concluded that the ERS Board incorrectly construed HRS §§ 88–281(a), 88–282(a), and 88–283; (3) that HRS §§ 88–281(a), 88–282(a), and 88–283, as well as the ERS Board's administration of retirement allowances pursuant to the foregoing statutory provisions, were vague, ambiguous, and confusing; and (4) that the circuit court did not exceed its jurisdiction in ordering that Helen could retroactively revise an irrevocable method of retirement allowance distribution.

Thus, inasmuch as Helen has not asserted "unilateral mistake" or "negligent misrepresentation" at any point in the present matter, the majority raises those issues *sua sponte* and as a matter of plain error.

2. *Based on our decision in Okada Trucking, this court cannot, sua sponte and as a matter of plain error, review an FOF that neither party has challenged on appeal.*

We have noted that "the appellate court's discretion to address plain error is always to be exercised sparingly" and have further observed as follows:

> *Our reluctance to reach plain error in civil cases is especially heightened in an appeal from an administrative proceeding with respect to questions of fact* or mixed questions of fact and law *that neither party has challenged at any point in the proceedings.* As we have noted, *unchallenged factual findings are deemed to be binding on appeal, which is to say no more than that an appellate court cannot,*

> *under the auspices of plain error, sua sponte revisit a finding of fact that neither party has challenged on appeal.*

*Okada Trucking,* 97 Hawai'i at 458–59, 40 P.3d at 81–82 (emphases added). *Okada Trucking* is controlling precedent as to the disposition of the present matter.

The ICA's *sua sponte,* plain error review in *Okada Trucking* is strikingly analogous to the manner in which the majority now raises and addresses the issues of negligent misrepresentation and unilateral mistake. *Okada Trucking* began its analysis of the effect of the plain error doctrine on unchallenged FOFs as follows:

> *At no point in its opinion did the ICA acknowledge, expressly or impliedly, that it was reviewing, sua sponte and as a matter of plain error, the hearing officer's uncontested factual finding* that the project entailed some work that had to be performed by a duly licensed plumbing subcontractor. *Findings of fact, however, that are not challenged on appeal are binding on the appellate court.*

97 Hawai'i at 458, 40 P.3d at 81 (emphases added) (citations omitted). In other words, *notwithstanding* (*i.e.,* as the word "however" in *Okada Trucking* connotes) that "the ICA [did not] acknowledge, expressly or impliedly, that it was reviewing *sua sponte* and as a matter of plain error" the FOFs at issue in that case, unchallenged FOFs are *always* "binding on the appellate court." *Id.* Moreover, our summary of the relevant factual background in *Okada Trucking* reflects that, although the ICA did not "expressly or impliedly" frame its analysis as plain error review, we nonetheless observed that the ICA had done so:

> In reaching its holding, the ICA *necessarily* held *sub silentio, as a matter of plain error,* that the hearings officer had *clearly erred* in finding that the project involved work that was required to be performed by a C–37 licensed subcontractor, as well as by duly licensed roofing and reinforcing steel subcontractors.

97 Hawai'i at 457, 40 P.3d at 80 (citations omitted) (emphases added). *Okada Trucking* also held that

> the ICA erred in holding *sua sponte* that the hearings officer 'was wrong' in deter-

mining that the nature of the project required Inter Island to subcontract with a duly licensed plumbing subcontractor, thereby holding, *sub silentio*, that the hearings officer had *plainly and clearly erred* in finding that it did.

*Id.* at 459, 40 P.3d at 82 (emphasis added).

Just as the ICA in *Okada Trucking* failed to admit that it was *sua sponte* engaging in plain error review of the hearing officer's uncontested factual finding, *see id.* at 458, 40 P.3d at 81, the majority in the present matter likewise does not expressly acknowledge its *sua sponte,* plain error review of the ERS Board's FOF Nos. 18 and 19, although the majority has arguably impliedly conceded that point, *see supra* section III.C. In any event, *Okada Trucking* recognized that, as is true of the majority in the present matter, *see supra* section III.C, whether the ICA "acknowledge[d]" that it was reviewing the relevant FOF for plain error or not, 97 Hawai'i at 458, 40 P.3d at 81, *by definition, see* HRAP Rule 28(b)(4) (characterizing a "plain error" as one that is "not presented"), the only mechanism by which the ICA *could* have reached the question whether the administrative hearings officer's FOF was clearly erroneous was by employing plain error analysis, inasmuch as the FOF at issue *was unchallenged* on appeal and, therefore, not foundational to any point of error raised by the appellant. *See Okada Trucking,* 97 Hawai'i at 457, 40 P.3d at 80.

Applying *Okada Trucking* to the present matter, it is apparent that the majority "necessarily" issues its holding *sua sponte,* "*sub silentio,* [and] as a matter of plain error." *Id.* Furthermore, because *Okada Trucking* observed that "[f]indings of fact ... that are not challenged on appeal are binding on the appellate court," 97 Hawai'i at 458, 40 P.3d at

81, and held that the ICA erred in holding *sua sponte* and *sub silentio* that the hearings officer's FOF was plainly and clearly erroneous, *see id.* at 459, 40 P.3d at 82, the majority's analysis stands as a blatant contravention of the controlling precedent of this court.

Thus, based on our reasoning and holding in *Okada Trucking,* and mindful that "[o]ur reluctance to reach plain error [in the present matter] is especially heightened" because it is "an appeal from an administration proceeding," I would adhere to the precedent set in *Okada Trucking* and would not, "under the auspices of plain error, *sua sponte* revisit a finding of fact that neither party has challenged on appeal." *Id.* at 458–59, 40 P.3d at 81–82. Nevertheless, even assuming *arguendo* that our jurisprudence authorizes plain error review of *unchallenged* agency findings, I still would not find plain error here because our standard of review precludes us from doing so.

3. *I would not invoke plain error in the present matter because to do so would require finding additional facts and, in my view, does not concern an issue of "great public import."*

As discussed *supra* in section II.D, in deciding whether to exercise plain error review, we "determine [ (1) ] whether the consideration of the issue requires additional facts, [ (2) ] whether the resolution of the question will affect the integrity of the findings of fact of the trial court[,] and [ (3) ] whether the question is of great public import." *Fujioka,* 55 Haw. at 9, 514 P.2d at 570 (internal citations omitted).

As a preliminary matter, if this court were to apply the *Fujioka* test to the present matter, the second factor would weigh in favor of invoking the plain error rule.[14] Nev-

14. I note that the relevant FOFs are those of the ERS Board and *not* the circuit court. The ERS Board acted as the "trial court" in the present matter, and it is the ERS Board's unchallenged FOF Nos. 18 and 19 that are binding on appeal. Simply put, the ERS Board *was* the trier of fact in the present matter, and the circuit court was the court of primary appeal, conducting judicial review of the contested case pursuant to HRS § 91–14. *See supra* note 7.

Assuming *arguendo* that this court were to review the ERS Board's FOF Nos. 18 and 19 for plain error, the integrity of the ERS Board's

FOFs *would* be affected by the resolution of the "plain error," such that the second *Fujioka* factor would favor the recognition of plain error in the present matter. *See, e.g., Office of Hawaiian Affairs v. State,* 96 Hawai'i 388, 396 n. 12, 31 P.3d 901, 909 n. 12 (2001) ("Because the effect of the Forgiveness Act is purely a question of law, *the outcome of which will affect the integrity of the circuit court's findings of fact,* and is a matter of great public import, we will exercise our discretion in addressing the matter." (Emphasis added.)); *Shanghai Inv. Co., Inc. v. Alteka Co., Ltd.,* 92 Hawai'i 482, 499–500, 993 P.2d 516,

533–34 (2000) (citing *Montalvo,*) applying the *Fujioka* test, and declining to notice plain error where *"[t]he error ... did not substantially affect the integrity of the jury's findings"* (emphasis added)), *overruled on other grounds by Blair v. Ing,* 96 Hawai'i 327, 331 n. 6, 31 P.3d 184, 188 n. 6 (2001); *Hill v. Inouye,* 90 Hawai'i 76, 82, 976 P.2d 390, 396 (1998) (recognizing plain error where, *inter alia,* the resolution of the error *"directly affects the family court's outcome* in this case"* (emphasis added)); *Montalvo,* 77 Hawai'i at 290–91, 884 P.2d at 353–54 (observing that "[t]he error here meets each of the three *Fox* [ (*i.e., Fujioka* ) ] factors" and specifically explaining that, as to the second prong of the *Fujioka* test, "[t]he error here ... *affects the integrity* of the jury's findings" (emphasis added)); *Fox,* 70 Haw. at 56, 760 P.2d at 675–76 (noting that, "[i]n exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously *affect the* fairness, *integrity* or public reputation of *judicial proceedings"* (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936) (internal quotation signals omitted)). Indeed, it would be illogical to notice plain error that would *not* affect the integrity of the trial court's FOFs, inasmuch as such error would be harmless.

It is noteworthy that this court has inconsistently applied the second *Fujioka* factor. *See Earl M. Jorgensen Co. v. Mark Constr., Inc.,* 56 Haw. 466, 476, 540 P.2d 978, 985 (1975) (recognizing plain error based upon, *inter alia,* the observation that "[t]he consideration of this issue raised for the first time on appeal will not affect the integrity of any findings of fact of the trial court"); *Fujioka,* 55 Haw. at 9, 514 P.2d at 570 (noticing plain error where, *inter alia,* "there is no material fact in issue"); *Hong v. Kong,* 5 Haw.App. 174, 177, 683 P.2d 833, 837 (1984) (reviewing FOFs entered by the circuit court, citing *Earl M. Jorgensen Co.* and *Fujioka,* and declining to notice plain error because, *inter alia,* "consideration of the new issue will affect the integrity of the findings of fact"); *Cabral v. McBryde Sugar Co., Ltd.,* 3 Haw.App. 223, 226–27, 647 P.2d 1232, 1234 (1982) (reviewing judgment entered on a jury verdict, citing *Fujioka,* and erroneously reasoning that plain error review was appropriate because, *inter alia,* "the resolution of the question will [*not* ] affect the integrity of the findings of fact").

Nevertheless, inasmuch as both *Earl M. Jorgensen Co.* and *Fujioka* involved appeals from orders granting summary judgment, there were no FOFs in those cases and the second prong of the *Fujioka* test did not apply. *See Earl M. Jorgensen Co.,* 56 Haw. at 476, 540 P.2d at 985 ("We have before us an appeal from a summary judgment. On a motion for summary judgment, the trial court does not try factual issues; rather, it determines whether there are any such issues to be tried." (Internal citations omitted.)); *Fujioka,* 55 Haw. at 9, 514 P.2d at 570 ("Here, the trial court rendered its judgment on a motion for summary judgment. Thus, there is no material

fact in issue ...."); *see also Birmingham v. Fodor's Travel Publications, Inc.,* 73 Haw. 359, 372 n. 7, 833 P.2d 70, 77 n. 7 (1992) (citing *Earl M. Jorgensen Co.* and *Fujioka,* and reasoning that, *inter alia,* "[b]ecause ... *the trial court rendered no findings of fact,* ... we would be justified in addressing this issue on appeal even if it had not been raised in the court below" (emphasis added)). In that connection, *Hong* and *Cabral,* which mistakenly rely upon *Earl M. Jorgensen Co.* and *Fujioka* in determining whether to exercise plain error review of findings by the trial court, do not represent the appropriate application of the second *Fujioka* factor. *See Hong,* 5 Haw.App. at 177, 683 P.2d at 837; *Cabral,* 3 Haw.App. at 226–27, 647 P.2d at 1234.

I also note that *Fujioka* was based upon *Greene v. Texeira,* 54 Haw. 231, 234–35, 505 P.2d 1169, 1172 (1973), which stated that this court has the discretion to recognize plain error "[i]f none of [three] factors are present," including "whether the issue goes to the integrity of the fact finding process." (Internal quotation signals and citations omitted). *See Fujioka,* 55 Haw. at 9, 514 P.2d at 570 (citing *Greene* ). Nevertheless, the *Greene* court applied the "integrity" factor in a nonsensical manner that is evident from the authority upon which *Greene* relied. The *Greene* court cited the flawed analysis of *In re Hawaiian Land Co.,* 53 Haw. 45, 487 P.2d 1070 (1971), which characterized *Kawamoto v. Yasutake,* 49 Haw. 42, 410 P.2d 976 (1966), as reasoning that this court "would not consider an argument on its merits first raised on appeal because" it would have "go[ne] to the integrity of the fact finding process[,]" *i.e.,* "[i]f the argument were well founded[,] ... a whole new trial would [have] be[en] required." *In re Hawaiian Land Co.,* 53 Haw. at 53, 487 P.2d at 1076.

In holding that it would not notice plain error, however, the *Kawamoto* court did *not* actually employ the analysis described by *In re Hawaiian Land Co.,* inasmuch as *Kawamoto* reasoned as follows:

It is unnecessary for this court to consider the merits of defendant's argument.... This court will not consider a question which was not raised and "properly preserved in the lower court." *Estate of Campbell,* 46 Haw. 475, 485, 382 P.2d 920, 934; *In re Guardianship of Matsuoka,* 45 Haw. 83, 88, 363 P.2d 964, 967; *Lindeman v. Raynor,* 43 Haw. 299, 301; *Clark v. Worrall,* 146 Mont. 374, 379–81, 406 P.2d 822, 825. As stated in *In re Goodfader's Appeals,* 45 Haw. 317, 343, 367 P.2d 472, 487, "It is clearly the obligation of counsel in any case to see to it that his objections to or grounds for action are made a part of the record."

*Kawamoto,* 49 Haw. at 45, 410 P.2d at 978. Indeed, the foregoing quotation does not suggest that this court should recognize plain error where the integrity of the FOFs would not be affected, but rather espouses the same principle as underlies *Okada Trucking,* to wit, that points of error not argued on appeal are deemed waived. Thus, because the *Greene* test is founded upon the mistaken interpretation of *Kawamoto* set forth in *In re Hawaiian Land Co.,* I would adhere to our more recent applications of the

ertheless, I would not notice plain error because the first and third prongs of the *Fujioka* test would not be satisfied, insofar as (1) I believe that the present matter—which is unique and unlikely to recur due to the subsequent amendments of HRS §§ 88–281(a), 88–282(a), and 88–283—is *not* "of great public import" and (2) this court cannot consider whether the current "retirement application, forms, and procedures," majority opinion at 221 n. 16, 118 P.3d at 1164 n. 16, constitute negligent misrepresentation or are likely to

cause a unilateral mistake, such that they present a continuing issue "of great public import," without "requir[ing] additional facts[.]" *Fujioka,* 55 Haw. at 9, 514 P.2d at 570 (internal citations omitted).

The amended form of HRS § 88–283 expressly provides that the "normal" retirement allowance (*i.e.,* the "maximum retirement allowance") that Katsumi elected *is* a distinct option for members of the ERS to choose.[15] *See supra* section III.A.2; *see also* HRS § 88–283(a) (Supp.2003).[16] The amend-

---

second prong of the *Fujioka* test, as exemplified by *Office of Hawaiian Affairs, Shanghai Inv. Co., Inc., Hill, Montalvo,* and *Fox. See supra.*

In any case, although I acknowledge that the "resolution [of the alleged plain error would] affect the integrity" of the ERS Board's FOF Nos. 18 and 19, *Fujioka,* 55 Haw. at 9, 514 P.2d at 570 (internal citations omitted), the alleged error would not satisfy the first and third prongs of the *Fujioka* test, as discussed *infra.*

15. The majority declares that, "[w]ere the statutes sufficiently comprehendible, the legislature would have no need to enact clarifications." Majority opinion at 221, 118 P.3d at 1164. Nevertheless, the majority does not expressly challenge my statutory interpretation. *See supra* sections III.A and III.B. Moreover, the majority's assertions are unpersuasive as to plain error, insofar as this court is less likely to notice plain error if the "retirement application, forms, and procedures," majority opinion at 221 n. 16, 118 P.3d at 1164 n. 16, as they exist today, do not present a continuing problem that could result in unilateral mistake or negligent misrepresentation to parties other than Katsumi. *Fujioka,* 55 Haw. at 9, 514 P.2d at 570 (internal citations omitted) (noting that we must determine whether "the question is of great public import"). In other words, the question whether the "retirement application, forms, and procedures" that allegedly resulted in Katsumi's loss of retirement benefits constituted negligent misrepresentation and were likely to have caused Katsumi's unilateral mistake is immaterial to our inquiry as to the third *Fujioka* factor (*i.e.,* focusing upon whether there is a *continuing* problem "of great public import," thereby implicating the *current* "retirement application, forms, and procedures").

16. In 2003 and 2004, the legislature amended HRS § 88–283 such that the statute now provides as follows:

Retirement allowance options. (a) *In lieu of the maximum retirement allowance described in sections 88–282, 88–284, and 88–285, a member may elect to receive the member's retirement allowance under one of the options described below, which shall be actuarially equivalent to the maximum retirement allowance:*

(1) Option A: A reduced allowance payable to the member, then upon the member's death, one-half of the allowance, including fifty per

cent of all cumulative post retirement allowances, to the member's beneficiary designated by the member at the time of retirement, for the life of the beneficiary; provided that for members retiring after November 30, 2004, in the event that the retirant's beneficiary dies at any time after the retirant retired, but before the death of the retirant, the retirant, upon the death of the retirant's beneficiary, shall receive a retirement allowance, including cumulative post retirement allowances, calculated as if the retirant had selected the maximum retirement allowance to which the retirant is entitled;

(2) Option B: A reduced allowance payable to the member, then upon the member's death, the same allowance, including cumulative post retirement allowances, paid to the member's beneficiary designated by the member at the time of retirement, for the life of the beneficiary; provided that for members retiring after November 30, 2004, in the event that the retirant's beneficiary dies at any time after the retirant retired, but before the death of the retirant, the retirant, upon the death of the retirant's beneficiary, shall receive a retirement allowance, including cumulative post retirement allowances, calculated as if the retirant had selected the maximum retirement allowance to which the retirant is entitled; or

(3) Option C: A reduced allowance payable to the member, and if the member dies within ten years of retirement, the same allowance, including cumulative post retirement allowances, paid to the member's beneficiary for the balance of the ten-year period.

(b) Any election of a mode of retirement shall be irrevocable and *subject to the spousal or reciprocal beneficiary notification requirement under subsection (c).*

(c) *No election under this section shall take effect unless:*

(1) *The spouse or reciprocal beneficiary of the member is furnished written notification that:*

(A) Specifies the retirement date, the benefit option selected, and the beneficiary designated by the member;

(B) Provides information indicating the effect of the election; and

(C) Is determined adequate by rules established by the board pursuant to chapter 91; or

ments to HRS § 88–283 also require that, "within a reasonable period of time before the [ERS] member's retirement date," the ERS Board provide the member "a written explanation of" (1) "[t]he terms and conditions of the various benefit options[,]" (2) "[t]he rights of member's spouse or reciprocal beneficiary under subsection (c) to be notified of the member's election of a benefit option[,]" and (3) "[t]he member's right to make, and the effect of, a revocation of an election of a benefit option[,]" HRS § 88–

(2) The member selects option A or option B and designates the spouse or reciprocal beneficiary as the beneficiary; or

(3) It is established to the satisfaction of the board that the notice required under paragraph (1) cannot be provided because:

(A) There is no spouse or reciprocal beneficiary;

(B) The spouse or reciprocal beneficiary cannot be located;

(C) The member has failed to notify the system that the member has a spouse or reciprocal beneficiary or has failed to provide the system with the name and address of the member's spouse or reciprocal beneficiary; or

(D) Of other reasons, as established by rules of the board pursuant to chapter 91. Any notice provided to a spouse or reciprocal beneficiary, or determination that the notification of a spouse or reciprocal beneficiary cannot be provided, shall be effective only with respect to that spouse or reciprocal beneficiary. The system shall rely upon the representations made by a member as to whether the member has a spouse or reciprocal beneficiary and the name and address of the member's spouse or reciprocal beneficiary.

(d) *Each member, within a reasonable period of time before the member's retirement date, shall be provided a written explanation of:*

(1) The terms and conditions of the various benefit options;

(2) The rights of the member's spouse or reciprocal beneficiary under subsection (c) to be notified of the member's election of a benefit option; and

(3) The member's right to make, and the effect of, a revocation of an election of a benefit option.

(e) The system shall not be liable for any false statements made by the member.

(f) In the event of the death of a member after the date of the filing of the member's written application to retire, but prior to the retirement date designated by the member, the designated beneficiary, if the member was eligible to retire on the date of the member's death, may elect to receive either:

(1) An allowance that would have been payable if the member had retired and had elected to receive a retirement allowance under option B; or

283(d). *See supra* note 16. In that connection, as discussed *supra* in section III.B, the "spousal notification requirement" of the amended HRS § 88–283(c) and the special beneficiary election provision of the amended HRS § 88–283(g), *see supra* note 16, ensure that the spouses of ERS members will not face the same misfortune as has befallen Helen. More specifically, individuals like Helen are now afforded both (1) written notification of the retirant's benefit election as a prerequisite to its taking effect, HRS § 88–

(2) The allowance under the option selected by the member which would have been payable had the member retired.

The effective date of the member's retirement shall be a first day of a month, except for the month of December when the effective date of retirement may be on the first or last day of the month, and shall be no earlier than the later of thirty days from the date the member's retirement application was filed or the day following the member's date of death. The election may not be made if, at the time of the member's death, there are individuals who are eligible to receive death benefits under section 88–286(c) who have made a claim for the benefits; provided that, if the designated beneficiary is an individual eligible to receive benefits under section 88–286(c), the designated beneficiary may receive benefits pursuant to an election under this section pending disposition of the claim for benefits under section 88–286(c). No death benefits will be payable under section 88–286(c) while benefits are paid pursuant to an election made under this section.

(g) *In the event of the death of the retirant within one year after the date of retirement, the retirant's beneficiary may elect to receive either:*

(1) *The death benefit under the retirement option selected by the retirant; or*

(2) *The death benefit under option B; provided that the difference between the benefit that the retirant received and the benefit that would have been payable to the retirant had the retirant elected to receive a retirement allowance under option B shall be returned to the system.*

(h) The increase in the retirant's benefit under options A and B upon the death of the retirant's designated beneficiary shall be effective the first day of the month following the date of death of the designated beneficiary. The retirant shall notify the system in writing and provide a certified copy of the beneficiary's death certificate. The system shall make retroactive benefit payments to the retirant, not to exceed six months from the date the written notification and the certified copy of the death certificate are received by the system. The retroactive payments shall be without interest.

2004 Haw. Sess. L. Act 179, § 27 at 873–75 (emphases added).

283(c), and, (2) in the event of the retirant's death within one year after the date of retirement (*e.g.*, as in the present matter, *see supra* section I.A), the discretion to revise the retirant's election and instead choose "option B," HRS § 88–283(a)(2), which provides the beneficiary a retirement allowance for life, HRS § 88–283(g).

Indeed, based on the amendments to the statutory scheme, I believe that the present matter is *not* "of great public import" because it clearly affects only Helen and is unlikely to pose a continuing problem. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Dacanay,* 87 Hawai'i 136, 145 n. 14, 952 P.2d 893, 902 n. 14 (Haw.App.1998) (declining to extend plain error review to the appellants' argument regarding unique settlement terms because it was not an "issue is of great public importance"). By contrast to the present matter, this court has *only* noticed plain errors "of great public import" in appeals concerning issues that would have borne upon individuals other than the parties to those cases. *See, e.g., Office of Hawaiian Affairs v. State,* 96 Hawai'i 388, 396 n. 12, 31 P.3d 901, 909 n. 12 (2001) (exercising plain error review "[b]ecause *the effect of the Forgiveness Act* is purely a question of law, the outcome of which will affect the integrity of the circuit court's findings of fact, and is a matter of great public import" (emphasis added)); *Montalvo,* 77 Hawai'i at 289–90, 884 P.2d at 352–53 (observing that *"failure to instruct [the] jury on the meaning of proximate legal cause,* when [the] issue [was] in dispute, [constituted] plain error requiring reversal" because the failure " 'seriously affect[ed] the fairness of the . . . proceeding' " (quoting *Morris v. Getscher,* 708 F.2d 1306, 1311 (8th Cir.1983) (emphasis added)); *Bertelmann v. Taas Associates,* 69 Haw. 95, 103, 735 P.2d 930, 935 (1987) (noticing plain error because *"the existence of . . . [a] cause of action* is of public importance and does not require additional facts" (emphasis added)); *Greene v. Texeira,* 54 Haw. 231, 235, 505 P.2d 1169, 1172 (1973) (recognizing plain error because "[t]he great importance to the public of a *proper interpretation of Hawaii's Survival Statute* is obvious" (emphasis added)); *Cabral v. McBryde Sugar Co., Ltd.,* 3 Haw. App. 223, 226–27, 647 P.2d 1232, 1234 (1982) (holding that the question whether "liability

for damage caused by the escape of waters impounded in reservoirs or ponds, or confined in their flow to artificial ditches, depends upon proof of some act of negligence" was of "great public import" (internal quotation signals and citations omitted))).

Notwithstanding the foregoing, the majority contends that "[the] defects [that resulted in the alleged unilateral mistake and negligent misrepresentation] stemmed from the confusing nature . . . of the retirement application, forms, and procedures." Majority opinion at 221 n. 16, 118 P.3d at 1164 n. 16. The majority insists that "the amendments to the statute do not solve the essential problem posed by the failure to adequately ensure that the intricacies of the retirement process must be ordinarily understood and to mandate that the ERS maintain 'user friendly' administrative practices and procedures for its members." Majority opinion at 221 n. 16, 118 P.3d at 1164 n. 16. For the reasons discussed *supra,* I disagree. Moreover, inasmuch as there is no evidence in the record as to the current state of the "retirement application, forms, and procedures," the majority has no basis for arguing that the such materials could possibly cause any "unilateral mistake" or "negligent misrepresentation" to present or future ERS members.

In that connection, it is true that my belief that "retirement application, forms, and procedures" no longer pose a question of "great public import" is, in my view, reasonably based upon the implications of the statutory amendments and *not* upon the record now before us, precisely because the current "retirement application, forms, and procedures" are *not* part of the record on appeal. Assuming *arguendo* that, in spite of the protections afforded by the amendments to HRS § 88–283, we were unsure whether this issue present a continuing problem "of great public import," this court *cannot* evaluate the ERS's current "retirement application, forms, and procedures" without contravening the first *Fujioka* factor by considering additional facts not in the record on appeal. *Fujioka,* 55 Haw. at 9, 514 P.2d at 570; *see, e.g., Montalvo,* 77 Hawai'i at 290–91, 884 P.2d at 353–54 (observing that "[t]he first factor is based on the tenet that an appellate court should not review an issue based upon an

undeveloped factual record"). That being the case, the record before us does *not* reflect that the present matter is "of great public import." Thus, given the record before us and the amendments to HRS § 88–283, I would hold that the present matter does not concern a "question ... of great public import," *Fujioka*, 55 Haw. at 9, 514 P.2d at 570 (internal citations omitted), and I would decline to find plain error even if this court were to engage in such review.

4. *The majority's exercise of HRS §§ 602–4 and 602–5(7) "review" sets a dangerous precedent.*

As a general matter, it is noteworthy that the majority's analysis represents a significant departure from our plain error jurisprudence. As noted *supra* in section III.C, the majority raises its arguments as an "exercise of our general superintendence of the trial courts ... and under our power to make such orders and mandates as necessary for the promotion of justice[.]" Majority opinion at 214, 118 P.3d at 1157 (footnotes omitted) (citing HRS §§ 602–4 and 602–5(7), *see supra* notes 12 and 13).

The majority's approach confers upon this court the unfettered discretion to resolve matters before it without regard to the points of error actually asserted by the parties in their appellate briefs. Simply put, the majority essentially renders obsolete our plain error standard of review. Pursuant to the majority's reasoning, whenever this court feels that the plain error doctrine is an inconvenient obstacle to achieving its desired outcome, it may simply circumvent the limits to our discretion established in *Okada Trucking* and *Fujioka* and proceed on the amorphous pretense of "promot[ing]" whatever "justice" it perceives at the moment.

Moreover, the majority essentially relegates this court to the role of advocating for a party. In exercising its "general superintendence" of the circuit court and in pursuing its view of "justice," the majority takes this court far afield from the arguments that were actually asserted by the parties, *see supra* sections III.C and III.C.1, and now stands as a surrogate for Helen's counsel.

Thus, mindful of (1) the folly of abandoning our plain error jurisprudence and (2) the importance of exercising judicial review in a manner that does not devolve into blatant advocacy on behalf of a particular party, I emphasize the necessity of adhering to the limits of the plain error doctrine, as set forth in *Okada Trucking* and *Fujioka.*

IV. *CONCLUSION*

In light of the foregoing analysis, I would vacate the circuit court's final judgment and remand this matter to the circuit court with instructions to affirm the August 16, 1999 final decision of the ERS Board.